UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

CRS HOLDING OF AMERICA, LLC,                    Case No. 8:14-bk-10142-____
et al,[1]                                       Chapter 11

              Debtor,
_____/

## DEBTOR'S EMERGENCY MOTION FOR ORDER
## AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL

---

*Emergency Relief Requested: For the reasons set forth more particularly in the Motion and in the Certificate of Necessity filed in support of same, the Debtor requests that the Court conduct a hearing on this Motion at the earliest opportunity and not later than September 3, 2014, and expects that such hearing will last no more than 30 minutes.*

---

Comes now Debtor, CRS HOLDING OF AMERICA, LLC (**"CRS"**), pursuant to 11 U.S.C.

Section 363(c)(2) and Fed. R. Bankr. P. 4001(b), and applies to this Court for authority to use cash

collateral, and in support thereof, CRS states as follows:

1.      That this is a core proceeding under 28 U.S.C. Section 157(b)(2)(M).

2.      That the voluntary petition in the above-styled case was filed on August 29, 2014

**("the Petition Date")**.

3.      That CRS is the debtor-in-possession in the above-styled case.

4.      That CRS, in conjunction with its subsidiaries, operates a full service electronics

---

[1]  The relief requested in this Motion is applicable to each of the following Debtors but is only being filed in the CRS Holding case pending a ruling on the Motions for Joint Administration filed in each Debtors' case: Bargain Computer Products of Ybor City, LLC, Creative Recycling Services, LLC, Creative Recycling Solutions, LLC, Creative Recycling Systems of Georgia, LLC, Creative Recycling Systems of Illinois, LLC, Creative Recycling Systems of Kentucky, LLC, Creative Recycling Systems of Louisiana, LLC, Creative Recycling Systems of North Carolina, LLC, Creative Recycling Systems of North Florida, LLC, Creative Recycling Systems of Pennsylvania, LLC, Creative Recycling Systems of South Florida, LLC, Creative Recycling Systems of Tennessee, LLC, Creative Recycling Systems, LLC, Creative Recycling Technologies II, LLC, Creative Recycling Technologies III, LLC, Creative Recycling Technologies, LLC, Dynamic Leasing LLC, Environmental Services Sales & Marketing, LLC, Greenrock Rare Earth Recovery, LLC, Creative Recycling Systems of New England, LLC, and Planet Gadget USA, LLC.

recycling business, providing e-waste recycling solutions for organizations of all sizes.

5.      That the revenues and other cash assets of CRS **("Cash")** are property of the bankruptcy estate that CRS may use under 11 U.S.C. Sec. 363.

6.      That the Cash may constitute cash collateral that Regions Bank and/or Regions Equipment Finance Corporation **(**collectively, **"Regions"),** JY Creative Holdings, Inc. **("JY")** and/or Intersection, LLC **("Intersection")** may claim a lien upon and/or an interest in by virtue of security instruments securing various loans made to the Debtor.

7.      In particular, Regions may claim a lien on cash collateral by virtue of, among other things, (i) that certain Security Agreement dated March 16, 2012 between Regions, as Lender, and CRS, as Borrower, a copy of which is attached hereto as **Exhibit "A",**[2] together with (ii) that certain UCC-1 Financing Statement filed by Regions with the Delaware Department of State at # 2012 1346958, and (iii) various UCC-1 Financing Statements filed by Regions with the Florida Secured Transaction Registry, including File Nos. 201002990694, 201002879610, 201003133000, 201003133035 filed on August 31, 2010, File No. 201103907326 filed on January 18, 2011, File No. 201105223440 filed on August 30, 2011, File No. 201105569452 filed on October 28, 2011, File No. 201206428412 filed on March 27, 2012, and File No. 21206473507 filed on April 3, 2012.

8.      Further, JY may claim that the Cash is cash collateral by virtue of, among other things, that certain Security Agreement dated February 8, 2013 between JYCHI, as Lender, and CRS, as Borrower, a copy of which is attached hereto as **Exhibit "B",**[3] together with the UCC Financing Statement filed with the Delaware Department of State at File No. 2013 0834664.

9.      Further, Intersection may claim that the Cash is cash collateral by virtue of, among

---

[2] The CRS Subsidiaries who have also filed Ch. 11 petitions in this Court are also named Borrowers under the Regions Security Agreement.
[3] The CRS Subsidiaries who have also filed Ch. 11 petitions in this Court are also named Borrowers under the JY Security Agreement

other things, that certain UCC Financing Statement filed with the Delaware Department of State at File No. 2013 1417188.[4]

10.    That the use of the cash collateral is essential to the ongoing operations of CRS as such cash collateral is necessary to fund administrative expenses, adequate protection payments, and all other operational funding needs of the Debtors.

11.    That CRS is prepared to offer, and does hereby offer, Regions—which holds a first position lien on the Debtors' assets and which claim is undersecured--adequate protection of their liens upon and/or interests in the Cash as follows:

    a.  Notwithstanding the provisions of 11 U.S.C. Sec. 552(a), a lien on the post-petition Cash, which lien shall be of the same extent, validity and priority that Regions, JYCHI and Intersection held prepetition.  However, any order adopting this offer shall not be construed as a determination as to the validity or priority of Regions', JYCHI's or Intersection's lien on the Cash.

    b.  Use of the Cash solely for ordinary course operating expenses, within a variance of +/- 15% consistent with the proposed budget attached hereto as **Exhibit "C",** and such other expenses outside the ordinary course of CRS's business as may be approved by the Court.

    c.  Providing Regions, JYCHI and Intersection with periodic statements of CRS's operations, income and expenses.

12.    That CRS estimates that approximately thirty (30) minutes will be required for a preliminary hearing on this Motion.

WHEREFORE, CRS respectfully requests that this Court enter an Order authorizing its use

---

[4] CRS's counsel does not currently possess an executed copy of any underlying Security Agreement in favor of Intersection.

of cash collateral in a manner consistent with the foregoing, and for such other and further relief as this Court deems just and proper.

SHUMAKER, LOOP & KENDRICK, LLP

/s/ Hugo S. deBeaubien
**JAY B. VERONA, ESQ.**
Florida Bar No. 352616
jverona@slk-law.com
**HUGO S. deBEAUBIEN, ESQ.**
Florida Bar No. 058100
bdebeaubien@slk-law.com
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
Phone: 813-229-7600
Fax: 813-229-1660
*Counsel for CRS*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, a true and correct copy of the foregoing **Motion** was served via CM/ECF Electronic Noticing or US Mail on the following:

| | |
|---|---|
| Regions Bank<br>c/o Grayson Hall, Jr., as President & CEO<br>1900 Fifth Avenue North<br>Birmingham, AL 35203 | Regions Equipment Finance Co.<br>c/o Grayson Hall, Jr., as President & CEO<br>1900 Fifth Avenue North<br>Birmingham, AL 35203 |
| Regions Bank<br>c/o Keith Fendrick, Esq.<br>Holland & Knight, LLP<br>100 North Tampa St.<br>Suite 4100<br>Tampa, FL 33602 | Regions Equipment Finance Co.<br>c/o Keith Fendrick, Esq.<br>Holland & Knight, LLP<br>100 North Tampa St.<br>Suite 4100<br>Tampa, FL 33602 |
| JY Creative Holdings, Inc.<br>c/o Providence Family Offices, LLC, as Registered Agent<br>202 S. Rome Ave, #150<br>Tampa, FL 33606 | Intersection, LLC<br>c/o Registered Office Service Company as Registered Agent<br>203 NE Front St. Suite 101<br>Milford, DE 19963 |
| JY Creative Holdings, Inc.<br>c/o Nathan Carney, Esq.<br>400 N. Ashley Drive<br>Suite 2600 | Intersection One, LLC<br>Jeffrey T. Kucera, Esq.<br>K&L Gates LLP<br>200 S. Biscayne Blvd. |

| | |
|---|---|
| Tampa, FL 33602 | Suite 3900<br>Miami, FL 33131 |
| Office of the United States Trustee<br>501 E. Polk St.<br>Suite 1200<br>Tampa, FL 33602 | 20 Largest / LBR 1007-2 Matrix |
| UnionBanCal Equities, Inc., Member<br>c/o Registered Agent Solutions<br>1220 South Street, Suite 150<br>Sacramento, CA 95811 | UnionBanCal Equities, Inc., Member<br>445 So. Figueroa St., 21st Floor<br>Los Angeles, CA 90071 |

/s/ Hugo S. deBeaubien
**Attorney**

# EXHIBIT A

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made and entered into as of March *16*, 2012, between REGIONS BANK, an Alabama banking corporation (the "Lender"), and CRS HOLDING OF AMERICA, LLC, a Delaware limited liability company, CREATIVE RECYCLING SYSTEMS, LLC, a Florida limited liability company, DYNAMIC LEASING LLC, a Florida limited liability company, BARGAIN COMPUTER PRODUCTS OF YBOR CITY, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF NORTH FLORIDA, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC, a Florida limited liability company, CREATIVE RECYCLING SERVICES, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF TENNESSEE, LLC, a Florida limited liability company, CREATIVE RECYCLING TECHNOLOGIES, LLC, a Florida limited liability company, CREATIVE RECYCLING TECHNOLOGIES II, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF PENNSYLVANIA, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF LOUISIANA, LLC, a Florida limited liability company, CREATIVE RECYCLING SOLUTIONS, LLC, a Florida limited liability company, CREATIVE RECYCLING TECHNOLOGIES III, LLC, a Florida limited liability company, ENVIRONMENTAL SERVICES SALES & MARKETING, LLC, a Florida limited liability company, CREATIVE RECYCLING SYSTEMS OF ILLINOIS, LLC, a Florida limited liability company, PLANET GADGET USA, LLC, a Florida limited liability company, and GREENROCK RARE EARTH RECOVERY, LLC, a Florida limited liability company (individually a "Borrower," and collectively the "Borrowers").

## Background

Borrowers have requested Lender to make them loans in the amounts of $1,500,000.00, $3,339,733.73, $3,500,000.00 and $4,000,000.00. Lender has agreed to make such loans to Borrowers pursuant to the provisions of a loan agreement dated of even date herewith between the Lender and the Borrowers, as amended from time to time (the "Loan Agreement").

In consideration of the Lender extending credit and making other financial accommodations to the Borrowers, as described in the Loan Agreement, Borrowers have agreed to collaterally assign and grant to Lender a continuing security interest in (including, without limitation, a continuing lien on and a continuing pledge of) all of each Borrower's Collateral (as hereinafter defined) as security for the payment and performance of all Obligations (as hereinafter defined) of the Borrowers to the Lender.

NOW THEREFORE, in consideration of their mutual covenants herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **Definitions.** The following definitions shall apply in the construction and interpretation of this Security Agreement:

1.1.   "Account" or "Accounts Receivable" shall include any right to payment for goods sold or services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

1.2.   "Collateral" shall mean all of each Borrower's present and future right, title and interest in and to any and all of the following property, wherever located, whether such property be now owned or hereafter acquired or arising:

(a)     All Inventory (as defined in Paragraph 1.5, herein);

(b)     All Accounts, Accounts Receivable, and Contract Rights (as defined in Paragraphs 1.1 and 1.3 herein), and chattel paper, regardless of whether or not they constitute proceeds of other Collateral;

(c)     All Equipment (as defined in Paragraph 1.4 herein);

(d)     All general intangibles, regardless of whether or not they constitute proceeds of other Collateral, including, without limitation, all of each Borrower's rights (which the Lender may exercise or not on behalf of the Lender as it in its sole discretion may determine) to acquire, obtain or sell goods and/or services with respect to the manufacture, processing, storage, sale, shipment or delivery of any of Borrower's Inventory, or of other Collateral; and also including, without limitation, all of Borrower's rights, privileges and benefits, including the option but not the obligation of performing, under the Loan Agreement;

(e)     All products of and accessions to any of the Collateral;

(f)     All liens, guaranties, securities, rights, remedies and privileges pertaining to any of the Collateral, including the right of stoppage in transit;

(g)     All obligations owing to each Borrower of every kind and nature, and all choses in action;

(h)     All tax refunds of every kind and nature to which each Borrower is now or hereafter may become entitled no matter however arising, including, without limitation, loss carry back refunds;

(i)     All goodwill, trade secrets, customer lists, trade names, trademarks, trademark applications, trade secrets, know-how, product designs and claims, patents, patent applications, licenses, franchise rights, royalty rights, the goodwill associated with any of the foregoing, and goodwill generally;

(j)     All documents and instruments (whether negotiable or non-negotiable, and regardless of their being attached to chattel paper) and contracts;

(k)     All commercial tort claims of each Borrower;

2

(l)     All proceeds from Collateral of every kind and nature and in whatever form, including, without limitation, both cash and noncash proceeds resulting or arising from the rendering of services by each Borrower or the sale or other disposition by each such Borrower of the Inventory or other Collateral;

(m)     All books and records relating to the conduct of each Borrower's business and other evidence of any Collateral, including, without limitation, the books and records relating to its Accounts Receivable; whether written, stored in computer memory, or stored on computer tape, disc or punch cards, and any equipment containing such evidences and/or necessary for the access to such evidences, including computer programs and computer service bureau contracts;

(n)     All deposit accounts maintained by each Borrower with any bank, trust company, investment firm or fund, or any similar institution or organization;

(o)     All leases, installment purchase contracts and other agreements affecting the use or occupancy of, or conveying an interest in, any personal property or improvements owned or occupied by each Borrower or any real property owned or occupied by each Borrower now or in the future, wherever located, now or hereafter entered into, including but not limited to each Borrower's interest as lessee or sublessee (by assignment or otherwise) under leases of real property occupied by each such Borrower now or in the future, and all rent and other payments payable under leases, installment purchase contracts and other agreements;

(p)     All awards or payments, including interest thereon, which may be made with respect to the Collateral or any real property owned or leased by each Borrower, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of the said right) or for any other entry to or decrease in the value of the Collateral or any real property owned or leased by each Borrower;

(q)     All proceeds of any and all unearned premiums on any insurance policies covering the Collateral, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Collateral or any real property owned or leased by each Borrower on the date hereof, and all proceeds arising from the sale or other disposition of any of the Collateral; and

(r)     The right, in the name and on behalf of each Borrower, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceedings to protect the interest of Lender in the Collateral.

Lender and Borrowers agree that the security interest created by this Security Agreement shall not extend to (i) any Contract Rights, licenses, permits or other similar Collateral which by their terms are not assignable and are not made assignable by the Code, or (ii) to "intent-to-use" trademarks of any Borrower.

1.3.　"Contract Rights" or "contract rights" means rights of each Borrower to payment under contracts not yet earned by performance and not evidenced by instruments or chattel paper.

1.4.　"Equipment" shall mean and include all of each Borrower's machinery, processors, tooling, equipment, office equipment, supplies customarily classified as equipment, furniture, trade fixtures, vehicles, motor vehicles, and all tangible personal property utilized in the conduct of each Borrower's business (but excluding therefrom "Inventory," as that term is defined in the Florida Uniform Commercial Code, as amended, ("Code")), and all replacements or substitutions therefor and all accessions thereto.

1.5.　"Inventory" shall include, without limitation, any and all goods held for sale or lease in Each Borrower's business, as now or hereafter conducted, including new and used motor supplies, components, finished goods, and other tangible property now owned or hereafter acquired (including acquisitions by return, repossession or otherwise) and held for sale or lease or furnished under contracts of service or used or consumed in each Borrower's business, supplies customarily classified as inventory, all products of and accessions to Inventory and all documents (including documents of title under the Code) covering inventory and documents of title.

1.6.　"Loan Documents" will include all documents relating to the loans made by the Lender to the Borrowers and shall include but not be limited to the Loan Agreement, Notes, all as defined in the Loan Agreement, and UCC filings, corporate resolutions, stockholder consents, attorney opinions and such other documents as may apply to this transaction.

1.7.　"Obligations" or "Obligation" means and includes the definition thereof set forth in Paragraph 2 hereof.

1.8.　All words and terms used in this Security Agreement other than those specifically defined in this Paragraph 1, and except as specifically otherwise defined elsewhere in this Security Agreement or in other Loan Documents (such definitions shall be applicable herein), shall be deemed to have the meanings accorded to them in the Code. Time is of the essence of any term, requirement, covenant or payment date contained in this Security Agreement as well as to any note, indebtedness, or Obligation owed by Borrowers to the Lender.

1.9.　Notwithstanding any provision of the Code which could be construed as excluding from the provisions thereof the collateral assignment and security interest herein provided for in leases of any real or personal property now or in the future owned or occupied by any Borrower, or in improvements on such property, on the basis that such collateral assignment of and security interest in leases or in improvements on such real property constitutes an interest in real estate excluded from the scope of the Code, it is the specific intention of Borrowers and Lender for themselves and their respective successors, assigns and all other parties claiming an interest through or under them, that the collateral assignment of, security interest in, and lien upon leases of any real or personal property owned, occupied or used by any Borrower, or in improvements on such real property, in favor of Lender herein provided for shall be deemed to be personal property (to the extent permitted by applicable law) and shall be governed and construed in accordance with the provisions of the Code, and as between Borrowers and Lender

4

for themselves and their respective successors and assigns as aforesaid, such leases shall be deemed to be general intangibles as defined in the Code and such improvements shall be deemed to be equipment as defined in the Code. In furtherance but not in limitation of the collateral assignment and security interest herein provided for in leases, Borrowers may execute specific assignments of rents and leases arising from real or personal property of each Borrower now or in the future leased to third parties, and specific assignments of their respective lessee's interest in leases with respect to real or personal property now or in the future leased by each such Borrower from third parties.

2. **Collateral Assignment and Security Interest.** Each Borrower hereby collaterally pledges, assigns and grants to Lender a continuing security interest in and lien on all the Collateral and any and all other property of every kind or description in the name of each such Borrower now or hereafter, for any reason or purpose whatsoever, whether in the possession or control of, or in transit to, Lender, or in which the Lender now or hereafter has a security interest and which secures any Obligations owed in any manner to Lender whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, for the prompt and unconditional payment and performance of all of the following, whether sole, joint or several, primary or secondary, direct or indirect, absolute or contingent, due or to become due, secured or not secured, now existing or hereafter arising, and all interest accrued thereon:

(a) the outstanding principal balance of all promissory notes of Borrowers to Lender pursuant to the Loan Agreement and interest accrued thereon;

(b) all other existing and future obligations of Borrowers hereunder and under the Loan Agreement and the other Loan Documents, as may be amended from time to time;

(c) all obligations of each Borrower to Lender under any Master Agreement (as such term as defined in the Loan Agreement);

(d) any renewals, enlargements, extensions or modifications thereof or additions thereto;

(e) any deficiency remaining upon enforcement of Lender's rights against all or any portion of the Collateral;

(f) all other existing debts, liabilities and obligations of Borrowers to Lender of every kind and description, of any nature whatsoever, whether or not evidenced by any note or other instrument or agreement;

(g) all costs, fees, disbursements, expenses and charges under any of the foregoing, including without limitation reasonable attorney's fees at trial and on appeal incurred by Lender in the collection or enforcement of any such obligation or the protection of any Collateral;

(all such payment and performance obligations set out herein, collectively meaning "Obligations" or "Obligation," for purposes of Paragraph 1.7 of this Agreement). Lender agrees

5

that this Security Agreement shall terminate upon payment in full of all the outstanding Obligations.

3. **Warranties, Covenants and Agreements.** Each Borrower warrants, covenants and agrees that:

3.1. Its chief executive office is located at 8108 Krauss Boulevard, Suite 110, Tampa, Florida 33610, and that all of each Borrower's records concerning the Collateral are and will be maintained at such address. Borrowers shall not change their chief executive office nor the place where they maintain their respective records concerning the Collateral without first providing prior written notice to Lender.

3.2. The locations at which Borrowers maintain their inventory (except in-transit inventory) are described in **Exhibit "A"** attached hereto and made a part hereof. Borrowers agree that they will not maintain and/or store the inventory of any Borrower at any location other than such locations without first providing Lender advance written notice. Borrowers further agree they will use their best efforts or require each landlord and location in which the Borrowers inventory is located to sign a landlord's waiver and consent form in a form acceptable to Lender.

3.3. That at the date hereof each Borrower is (and as to Collateral that each such Borrower may acquire after the date hereof, will be) the lawful owner of the Collateral, and that the Collateral, and each item thereof, is, will be, and shall continue to be free of all liens, encumbrances, collateral assignments or other right, title or interest (other than the security interest therein granted to Lender hereby or permitted pursuant to the provisions of the Loan Agreement); that each Borrower has and will have full power and authority to collaterally assign and grant to Lender a continuing security interest therein and lien thereon; that each Borrower has not transferred, collaterally or absolutely assigned, sold, pledged, encumbered subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of each such Borrower's right, title or interest therein) to any person other than Lender, in each case, except as otherwise permitted under the Loan Agreement or this Security Agreement; that the Collateral is and will be valid and genuine in all material respects; and that all Accounts Receivable included in the applicable borrowing base under the Loan Agreement arise out of legally enforceable and existing contracts, payable in accordance with their tenor; and, except for contract rights, no part of the Collateral (or the validity or enforceability by Lender thereof) is or shall be contingent upon the fulfillment of any agreement or condition whatsoever; and that each Borrower will warrant and defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.4. All monies due to each Borrower under any Collateral and all documents executed in connection with the Collateral are hereby collaterally assigned to the Lender. Upon the occurrence of an Event of Default under the Loan Agreement or the other Loan Documents and the expiration of any applicable grace period and at the option of the Lender, and for so long as such Event of Default shall be continuing, all such monies shall be paid directly to the Lender and applied to the Obligations as herein defined, until such time as all of said Obligations shall have been paid in full.

6

3.5.    That (a) no payments due or to become due under any Collateral so giving rise to payments have been otherwise assigned (except as permitted by the Loan Agreement); (b) no payments due or to become due on any date subsequent to the date of this Security Agreement have been collected in advance of the time when the same become due under the terms of any Collateral so giving rise to payments other than in the ordinary course of business; and (c) that any Collateral constituting agreements, contracts, accounts and the like is valid and enforceable subject to applicable equitable principles, bankruptcy and other similar insolvency laws and has not been materially altered, modified or amended in any material manner whatsoever.

3.6.    The Lender shall not be obligated to perform or discharge, nor does the Lender hereby undertake to perform or discharge, any obligation, duty or liability under any Collateral constituting agreements, contracts and the like, or under or by reason of this Security Agreement; and each Borrower shall, and does hereby agree to indemnify Lender for and to hold Lender harmless from any and all liability, loss, damage or reasonable attorney fees which may or might be incurred by reason of this Security Agreement or for any other reason growing out of the operation of each Borrower's business including but not limited to product liability suits, and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on Lender's part to perform or discharge any of the terms, covenants or agreements contained in this Security Agreement, or in any Collateral constituting agreements, contracts and the like. Should Lender incur any such liability under or by reason of this Security Agreement or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees through and including the cost of any appeals and appellate costs, shall be secured hereby; and each Borrower shall reimburse Lender therefor immediately upon demand. It is further understood that this Security Agreement shall not operate to place responsibility upon Lender for carrying out any of the terms and conditions of any Collateral constituting agreements, contracts and the like.

3.7.    Each Borrower will maintain in force one or more policies of insurance covering public premises liability and Inventory, motor vehicles, Equipment and other insurable Collateral against risks of fire (with customary extended coverage), sprinkler leakage, theft, products liability, spoilage, loss or damage and other hazards and risks customarily insured against by companies engaged in businesses similar to that of each Borrower or that Lender may require, in amounts and containing such terms as are customarily maintained by similar businesses, in such form, for such periods, covering such hazards and written by such companies as may be satisfactory to Lender, such insurance to contain standard lender's loss payable clauses in favor of Lender and to be payable first to Lender as its interest may appear in the event of loss and then to each such Borrower; certificates of insurance evidencing such coverage shall be provided to Lender upon request; no loss shall be adjusted thereunder without Lender's approval; and all such policies shall provide that they may not be cancelled without first giving at least thirty (30) days' written notice of cancellation to Lender. In the event that any Borrower fails to provide evidence of the maintenance of such insurance satisfactory to Lender, Lender may, at its option, secure such insurance and charge the cost thereof to Borrowers, or any other account of any Borrower with Lender. At the option of the Lender, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations. Lender is hereby appointed each

Borrower's attorney-in-fact to endorse any draft or check which may be payable to each such Borrower in order to collect returned or unearned premiums or the proceeds of such insurance.

3.8. Each Borrower will at all times keep accurate and complete records of its Inventory, Accounts, Accounts Receivable, Equipment and other Collateral and the proceeds thereof, and each Borrower will submit to Lender, in form satisfactory to Lender, such certificates, reconciliations and schedules relating to Inventory, Accounts, and Accounts Receivable and such other information concerning Borrower's business affairs, as Lender may from time to time require pursuant to the Loan Agreement.

3.9. No Borrower will during the term of this Security Agreement or any renewal or extension thereof, operate its respective business other than in the normal and customary course.

3.10. Subject to the terms and conditions of the Loan Agreement, Lender shall have the right to call at each Borrower's place or places of business to audit, the Inventory and Equipment and audit, check and make extracts from the books, records, journals, orders, receipts, correspondence and other data relating to Collateral assigned hereunder or to any other transactions between the parties hereto.

3.11. No Borrower will grant to any third person a security interest in any Collateral without the prior permission of Lender, except as otherwise permitted under the Loan Agreement.

3.12. Each Borrower will immediately notify Lender of any material loss or damage to, or material diminution in or any occurrence which would adversely in any material respect affect the value of, the Inventory, the Equipment or other Collateral.

4. **Proceeds.** The Lender's security interest hereunder shall attach to all proceeds of all sales or other dispositions of each Borrower's Inventory. Each Borrower agrees that such Borrower will not sell, transfer or assign any or all of any such Borrower's interests in any Inventory except in the regular course of business and upon terms which are customary or normal in each such Borrower's business, or as otherwise permitted under the Loan Agreement or this Security Agreement. Each Borrower represents and warrants to Lender that the Inventory is not subject to any security interest, encumbrance or lien, or the claim of any third person and will not hereafter be subject to any security interest, encumbrance, lien or claim other than that granted to Lender hereunder, in each case except as otherwise permitted under the Loan Agreement.

5. **Notice to Account Debtor and Contract Parties.** Upon the occurrence and during the continuance of an Event of Default, without in any way waiving such default, Lender shall have the right, without further notice, to notify the account debtors obligated on any or all Accounts, Accounts Receivable, Contract Rights and chattel paper assigned or in which the Lender has a security interest hereunder, to make payment thereof or thereon directly to Lender, and to take control of all proceeds of any such Accounts Receivable, Contract Rights and chattel paper, whether such proceeds are cash or checks (hereinafter collectively called "cash proceeds") or negotiable instruments other than checks, or chattel paper or other proceeds (hereinafter

collectively called "non-cash proceeds"), with full power upon the occurrence and during the continuance of an Event of Default hereunder or under the Loan Documents, to settle or compromise disputed claims on such Accounts, Accounts Receivable, Contract Rights and chattel paper. Until such time as Lender shall elect to exercise such right by causing Lender to mail to Borrowers written notice thereof, each Borrower is authorized, as agent of Lender, to collect and enforce each Borrower's Accounts, Accounts Receivable, Contract Rights and chattel paper. The costs of such collection and enforcement, including attorneys' fees and out-of-pocket expenses, shall be borne solely by Borrower whether the same are incurred by Lender or Borrower.

6.      **Sale in the Ordinary Course of Business.**

6.1.      Unless an Event of Default has occurred and is continuing, Borrowers shall have the right, in the regular course of business and upon terms which are customary or normal in each such Borrower's business, to process, sell, service, and collect receipts of such Borrower's Inventory. Lender's security interest shall attach to all cash proceeds and non-cash proceeds of such Borrower's Accounts, Accounts Receivable, Contract Rights and chattel paper and Inventory, including without limitation the full amount of all cash and non-cash proceeds deposited in any deposit accounts of such Borrower and commingled with other funds.

6.2.      Upon the occurrence of an Event of Default hereunder and after notice from Lender, each Borrower shall deliver to Lender all non-cash proceeds received by each such Borrower, with such endorsements and assignments as may be necessary to transfer title thereto to Lender, not later than the business day following their receipt; and shall deposit not later than the business day following their receipt all cash proceeds with appropriate endorsements where necessary, in an account with Lender (herein called "Collection Account"). Pending such delivery or deposit, Borrowers agrees that they will not commingle any such collection with any of its other funds or property, but will hold them separate and apart therefrom and upon an express trust for Lender until delivery to or deposit with Lender.

6.3.      Notwithstanding anything to the contrary in this Agreement, in the event that for any period of time the Lender does not elect to exercise its Collection Account rights under the foregoing paragraph 6.2, each Borrower may retain collections on Accounts Receivable and cash sales or other dispositions of Inventory during such period.

6.4.      Upon the Lender's election to enforce its rights pursuant to paragraph 6.2 hereof all cash proceeds deposited in the Collection Account and all cash proceeds realized from the collection by Lender or Borrowers of non-cash proceeds, the foregoing received, deposited and collected pursuant to paragraph 6.2, shall be allocated by Lender, at least once a week, for application in whole or in part, against the Obligations, the order and method of such application to be first to costs and expenses of Lender, then to interest then accrued and then to principal.

7.      **Possession of Collateral.** Upon the Lender's demand, and the occurrence and during the continuance of an Event of Default by Borrowers hereunder, each Borrower shall deliver possession of each such Borrower's Collateral to Lender. Borrowers shall pay all costs incurred in transferring possession of the Collateral to Lender and for storage of the Collateral while in possession of Lender and Borrower agree that in the event Borrowers fail to pay such

9

costs, Lender may do so for Borrowers and the cost thereof shall be considered a part of the Obligations hereunder.

8. **Attorney-In-Fact.** Each Borrower hereby irrevocably constitutes and appoints Lender as each such Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrowers but for the sole benefit of the Lender, to convert the Collateral into cash, including, without limitation, completing the processing of work in process, and the sale (either public or private) of all or any portion or portions of the Inventory and other Collateral; to enforce collection of the Collateral, either in its own name, in the name of Lender, or in the name of each such Borrower, including, without limitation, executing releases, compromising or settling with any account debtor and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to each such Borrower, and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest, and to accept receipt for, and endorse all receipts, checks, notes, instruments, agreements and letters; to notify Postal Service authorities to change the address for delivery of mail addressed to any Borrower to such address as Lender shall designate; to sign and endorse the name of each such Borrower on and to receive as secured party any of the Collateral, any invoices, Schedules of Collateral, or documents of title of the same or different nature relating to the Collateral; to sign the name of each such Borrower on any notice or verification of the Accounts Receivable to the account debtors; and to sign and file or record on behalf of each such Borrower any financing or other statement in order to perfect or protect Lender's security interest, and do all acts and things which Lender may deem necessary to perfect and continue perfected the continuing security interest created by this Security Agreement; all of the foregoing being exercisable by Lender only at such times as an Event of Default has occurred and is then continuing. Lender shall not be obligated to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to any Borrower or anyone else except for gross negligence or willful misconduct in bad faith. All powers conferred upon Lender by this Security Agreement, being coupled with an interest, shall be irrevocable so long as any Obligations of Borrowers to Lender shall remain unpaid.

Under the authority of this paragraph, whenever Lender deems it desirable after the occurrence of an Event of Default that any legal action be instituted with respect to any Collateral or that any other action be taken in an attempt to effectuate collection of any Collateral, Lender may reassign the item in question to Borrowers (and if Lender shall execute any such reassignment, it shall automatically be deemed to be without recourse to Lender in any event) and require Borrowers to proceed with such legal or other action at Borrowers' sole liability, cost and expense, in which event all amounts collected by Borrowers on such item shall nevertheless be subject to the provisions of this Security Agreement.

9. **Preservation of Collateral.**

9.1. Each Borrower agrees that it assumes full responsibility for preservation of the Collateral, including maintaining the Collateral in good condition and repair, ordinary wear and tear excepted, and taking any steps necessary to preserve any right of any such Borrower or Lender in it against prior parties, including paying and discharging, or causing to be

10

paid and discharged, all taxes, levies, and other impositions levied thereon and paying or causing to be paid any rent or mortgage payments due on premises where the Collateral is held or may be held.

9.2.     Lender will have exercised reasonable care of any Collateral in its possession if it takes such action for that purpose as Borrowers shall reasonably request in writing; but no omission to do any act not requested by Borrowers shall be deemed a failure to exercise reasonable care, and no omission to comply with any request of Borrowers shall of itself be deemed a failure to exercise reasonable care; provided, however, that Lender shall not be required in any manner to make any demand or inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claims, or to take any other action to collect or enforce the payment of any amount which may become due or payable on any Account Receivable or security therefor.

9.3.     Notwithstanding the foregoing, Lender may, at its option, from time to time after the occurrence and during the continuance of an Event of Default, discharge any taxes, liens or encumbrances on any of the Collateral, pay any rent payments due on premises where the Collateral is held, or take any other action that Lender may deem proper to repair, maintain or preserve any of the Collateral, and Borrowers will pay to Lender on demand, or Lender, in its sole discretion, may charge to Borrowers all amounts so paid or incurred by them or as a debit charge against any Borrower's loan account or other account of any Borrower with Lender.

10.     **Financing Statements.** Borrowers will pay all costs of filing any financing, continuation, or termination statements with respect to the security interest created by this Security Agreement. Borrowers will execute and deliver to Lender any writings and do all things necessary or reasonably requested by Lender to carry into effect the provisions and intent of this Security Agreement, or to vest more fully in or assure to Lender (including, without limitation, all steps to create and perfect) the continuing security interest in the Collateral granted to Lender by this Security Agreement or to comply with applicable statutes or law and to facilitate the collection of the Collateral.

11.     **Event of Default.** An "Event of Default" hereunder shall mean the occurrence of an Event of Default under the Loan Agreement. Time is of the essence of any term, requirement, covenant, or payment date contained in this Security Agreement or any other Loan Document.

12.     **Remedies.**

12.1.     The Lender is hereby authorized, at its election, at any time or times after an Event of Default has occurred and is continuing, and without any further demand or notice except to such extent as notice may be required by applicable law, to sell or otherwise dispose of all or any of the Collateral at public or private sale; and Lender may exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it or them by applicable law, all as Lender may determine.

12.2.     If notice of a sale or other action by Lender is required by applicable law, Borrowers agree that ten (10) days' written notice to Borrowers, or the shortest period of written notice permitted by such law, whichever is larger, shall be sufficient; and that to the extent

permitted by such law, Lender, its officers or its attorneys may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations, and any sale (public or private) shall be free from any right of redemption, which each Borrower hereby waives and releases. No purchaser (other than Lender or Lender's agents) at any sale (public or private) shall be responsible for the application of the purchase money.

12.3. The Lender shall have the unrestricted right from time to time after the occurrence and during the continuance of an Event of Default to apply (or to change any applications already made of) the proceeds of any of the Collateral to the Obligations in accordance with the terms of the Loan Agreement.

12.4. Any balance of the net proceeds of sale remaining after paying all Obligations of Borrowers to Lender, and all costs and expenses of finishing work in process, processing, completion, installation, collection, storage, custody, sale and delivery of the Inventory, collection of the Accounts Receivable, contract rights and other similar Collateral, sales of the Equipment and all other expenses, including, without limitation, reasonable attorneys' fees, and the remainder shall be returned to Borrowers or to such other party as may be legally entitled thereto; and if there is a deficiency, Borrowers shall be responsible for the same, with interest at the default rate set forth in the Obligations.

13.    **Enforcement**. Lender shall have the right at all times to enforce the provisions of this Security Agreement in strict accordance with the terms hereof, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times. The failure of Lender at any time or times to enforce its rights under such provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific provisions of this Security Agreement or as having in any way or manner modified or waived the same. All rights and remedies of Lender are cumulative and concurrent, and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy. Nothing herein contained shall preclude Lender at any time from enforcing Borrowers' Obligations in accordance with their terms.

14.    **Waiver**. Borrowers hereby waive presentment, demand for payment, notice of dishonor, protest and notice of protest of the Collateral, notice of maturity, notice of non-payment, and any and all other notices or demands in connection herewith. Borrowers further waive any right to assert in any bankruptcy proceeding in which any Borrower is a debtor (i) that the Collateral should be valued by any method other than liquidation value where Lender seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that the Lender's security interest in cash proceeds of Collateral is limited to any amount less than the actual amount of such proceeds deposited in deposit accounts of each Borrower and commingled with other funds, (iii) use of cash proceeds of Collateral without the written consent of Lender unless authorized by the bankruptcy court in which such bankruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of Collateral unless Lender is granted an additional substitute lien in other property to the extent such cash proceeds are used by Borrowers.

15. **Term and Termination.** The term of this Security Agreement shall commence with the date hereof and end upon the payment of the Obligations in full and the termination of all credits established by Lender in favor of Borrowers.

16. **Governing Law.** The laws of Florida shall govern the construction of this Agreement and the rights and duties of the parties hereto.

17. **Benefit.** This Security Agreement shall inure to the benefit of Lender's successors and assigns and shall be binding on each Borrower's successors and assigns.

18. **Loan Documents.** This Security Agreement is executed pursuant to the terms of the Loan Agreement, together with the other Loan Documents, and all amendments and renewals thereof. Default in any of the terms and conditions hereof shall constitute a default thereunder, and default in any of the terms and conditions thereof shall constitute a default hereunder. The rights and remedies provided in this Security Agreement, the Loan Agreement, and the other Loan Documents are cumulative and not exclusive of any rights or remedies provided by law, and in the event of any irreconcilable inconsistency between any provision of this Security Agreement and any provision of the Loan Agreement, the provision of the Loan Agreement shall control.

19. **Intercreditor and Subordination Agreement.** Lender and certain other parties have entered into an Intercreditor and Subordination Agreement (as such term is defined in the Loan Agreement) which effects certain rights and remedies of Lender under this Security Agreement in accordance with the terms and conditions of the Intercreditor and Subordination Agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused these presents to be duly executed to be effective as of the day and year first above written.

REGIONS BANK, an Alabama banking corporation

By: _____

~~Jonathan A. Yob, as its~~ and Greg Hoerbelt

~~Manager~~ Senior Vice President

CRS HOLDING OF AMERICA, LLC, a Delaware limited liability company

By: _____

Jonathan A. Yob, as its
Manager

13

CREATIVE RECYCLING SYSTEMS, LLC,
a Florida limited liability company

By: _____
　　Jonathan A. Yob, as its
　　Manager


DYNAMIC LEASING LLC,
a Florida limited liability company

By: _____
　　Jonathan A. Yob, as its
　　Manager


BARGAIN COMPUTER PRODUCTS OF YBOR
CITY, LLC, a Florida limited liability company

By: _____
　　Jonathan A. Yob, as its
　　Manager


CREATIVE RECYCLING SYSTEMS OF NORTH
FLORIDA, LLC, a Florida limited liability
company

By: _____
　　Jonathan A. Yob, as its
　　Manager


CREATIVE RECYCLING SYSTEMS OF SOUTH
FLORIDA, LLC, a Florida limited liability
company

By: _____
　　Jonathan A. Yob, as its
　　Manager


14

CREATIVE RECYCLING SYSTEMS OF
GEORGIA, LLC, a Florida limited liability
company

By: _____
Jonathan A. Yob, as its
Manager


CREATIVE RECYCLING SERVICES, LLC, a
Florida limited liability company

By: _____
Jonathan A. Yob, as its
Manager


CREATIVE RECYCLING SYSTEMS OF NORTH
CAROLINA, LLC, a Florida limited liability
company

By: _____
Jonathan A. Yob, as its
Manager


CREATIVE RECYCLING SYSTEMS OF
KENTUCKY, LLC, a Florida limited liability
company

By: _____
Jonathan A. Yob, as its
Manager


CREATIVE RECYCLING SYSTEMS OF
TENNESSEE, LLC, a Florida limited liability
company

By: _____
Jonathan A. Yob, as its
Manager


15

CREATIVE RECYCLING TECHNOLOGIES,
LLC, a Florida limited liability company

By: _____
    Jonathan A. Yob, as its
    Manager


CREATIVE RECYCLING TECHNOLOGIES II,
LLC, a Florida limited liability company

By: _____
    Jonathan A. Yob, as its
    Manager


CREATIVE RECYCLING SYSTEMS OF
PENNSYLVANIA, LLC, a Florida limited liability
company

By: _____
    Jonathan A. Yob, as its
    Manager


CREATIVE RECYCLING SYSTEMS OF
LOUISIANA, LLC, a Florida limited liability
company

By: _____
    Jonathan A. Yob, as its
    Manager


CREATIVE RECYCLING SOLUTIONS, LLC, a
Florida limited liability company

By: _____
    Jonathan A. Yob, as its
    Manager

16

CREATIVE RECYCLING TECHNOLOGIES III,
LLC, a Florida limited liability company

By: _____
    Jonathan A. Yob, as its
    Manager


ENVIRONMENTAL SERVICES SALES &
MARKETING, LLC, a Florida limited liability
company

By: _____
    Jonathan A. Yob, as its
    Manager


CREATIVE RECYCLING SYSTEMS OF
ILLINOIS, LLC, a Florida limited liability
company

By: _____
    Jonathan A. Yob, as its
    Manager


PLANET GADGET USA, LLC, a Florida limited
liability company

By: _____
    Jonathan A. Yob, as its
    Manager


GREENROCK RARE EARTH RECOVERY, LLC,
a Florida limited liability company

By: _____
    Jonathan A. Yob, as its
    Manager

# EXHIBIT A

## LOCATIONS OF INVENTORY

| |
|---|
| 14412-20 Commerce Way, Miami Lakes, FL 33016 |
| 8108 Krauss Boulevard, Tampa, FL 33619 |
| 1831 Massaro Boulevard, Tampa, FL 33619 |
| 3110 Cherry Palm Drive, Suite 330, Tampa, FL 33619 |
| 278 Windy Point Drive, Glendale Heights, IL 60139 |
| 7100 Intermodal Drive, Louisville, KY 40258 |
| 619 Distribution Drive, Suite C, Durham, NC 27560 |
| 627 Distribution Drive, Durham, NC 27560 |
| 250 Boulder Drive, Breinigsville, PA 18031 |
| 1429 Donelson Pike, Nashville, TN 37217 |
| 85 North Industrial Road Palmetto, GA 30268 |
| 4716 Capitol Circle SW, Tallahassee, FL 32305 |
| 1501 Perryman Road, Aberdeen, MD 21001 |
| 4410 East Adams Drive, Tampa, FL 33605 |

The tenant that is party to the following two leases is Innovative Recycling Technologies, Inc., which is an entity owned by Lisandra Pizarro-Yob. These two facilities are used by Creative Recycling Systems, Inc. to store glass and other materials coming out of cathode ray tubes until they are ready for processing.

| |
|---|
| 2903 Hitzert Court, Fenton, MO 63026 |
| 251 Corporate Park Blvd., Columbia, SC |

# EXHIBIT B

# SECURITY AGREEMENT

**THIS AGREEMENT,** is made and entered into as of February 8, 2013, between JY CREATIVE HOLDINGS, INC., a Florida corporation (the "Lender"), and CRS HOLDING OF AMERICA, LLC, a Delaware limited liability company, and CREATIVE RECYCLING SYSTEMS, LLC, DYNAMIC LEASING LLC, BARGAIN COMPUTER PRODUCTS OF YBOR CITY, LLC, CREATIVE RECYCLING SYSTEMS OF NORTH FLORIDA, LLC, CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC, CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC, CREATIVE RECYCLING SERVICES, LLC, CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC, CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC, CREATIVE RECYCLING SYSTEMS OF TENNESSEE, LLC, CREATIVE RECYCLING TECHNOLOGIES, LLC, CREATIVE RECYCLING TECHNOLOGIES II, LLC, CREATIVE RECYCLING SYSTEMS OF PENNSYLVANIA, LLC, CREATIVE RECYCLING SYSTEMS OF LOUISIANA, LLC, CREATIVE RECYCLING SOLUTIONS, LLC, CREATIVE RECYCLING TECHNOLOGIES III, LLC, ENVIRONMENTAL SERVICES SALES & MARKETING, LLC, CREATIVE RECYCLING SYSTEMS OF ILLINOIS, LLC, PLANET GADGET USA, LLC, and GREENROCK RARE EARTH RECOVERY, LLC, each a Florida limited liability company (herein sometimes separately referred to as "Debtor" and collectively referred to as the "Debtors"). CRS HOLDING OF AMERICA, LLC is herein sometimes referred to separately as the "Parent." The Debtors, other than CRS HOLDING OF AMERICA, LLC, are herein sometimes separately referred to as "Subsidiary" and together referred to as the "Subsidiaries."

## Background

Parent is indebted to Lender under the Secured Note (as defined below), each Subsidiary has guaranteed the Secured Note under the Guaranty Agreement (as defined below), Parent has agreed to grant to Lender a continuing security interest in (including, without limitation, a continuing lien on and a continuing pledge of) all of Parent's Collateral (as defined below) as security for repayment of the Secured Note, and each Subsidiary has agreed to grant to Lender a continuing security interest in (including, without limitation, a continuing lien on and a continuing pledge of) all of that Subsidiary's Collateral (as defined below) as collateral security for the obligations of that Subsidiary under such Guaranty Agreement.

**NOW, THEREFORE,** for and in consideration of the premises, the mutual covenants and agreements contained in this Security Agreement, and for other good and valuable consideration, the receipt, legal sufficiency, and reasonably equivalent value of which, are hereby mutually acknowledged, the parties, intending to be legally bound, agree as follows:

## I. Definitions.

The following definitions shall apply in the construction and interpretation of this Security Agreement:

1.1. "Account" or "Accounts Receivable" shall include any right to payment for goods sold or services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

1

1.2.    "Collateral" as used in reference to a Debtor, shall mean that Debtor's present and future right, title and interest in and to any and all of the following property, wherever located, whether such property be now owned or hereafter acquired or arising:

(a)    All Inventory (as defined in Paragraph 1.5, herein);

(b)    All Accounts, Accounts Receivable, and Contract Rights (as defined in Paragraphs 1.1 and 1.3 herein), and chattel paper, regardless of whether or not they constitute proceeds of other Collateral;

(c)    All Equipment (as defined in Paragraph 1.4 herein);

(d)    All general intangibles, regardless of whether or not they constitute proceeds of other Collateral, including, without limitation, that Debtor's rights (which the Lender may exercise or not on behalf of the Lender as it in its sole discretion may determine) to acquire, obtain or sell goods and/or services with respect to the manufacture, processing, storage, sale, shipment or delivery of any of that Debtor's Inventory, or of other Collateral; and also including, without limitation, all of that Debtor's rights, privileges and benefits, including the option but not the obligation of performing, under the Secured Note and related Loan Documents;

(e)    All products of and accessions to any of the Collateral;

(f)    All liens, guaranties, securities, rights, remedies and privileges pertaining to any of the Collateral, including the right of stoppage in transit;

(g)    All obligations owing to that Debtor of every kind and nature, and all choses in action;

(h)    All tax refunds of every kind and nature to which that Debtor is now or hereafter may become entitled no matter however arising, including, without limitation, loss carry back refunds;

(i)    All goodwill, trade secrets, customer lists, trade names, trademarks, trademark applications, trade secrets, know-how, product designs and claims, patents, patent applications, licenses, franchise rights, royalty rights, the goodwill associated with any of the foregoing, and goodwill generally;

(j)    All documents and instruments (whether negotiable or non-negotiable, and regardless of their being attached to chattel paper) and contracts;

(k)    All commercial tort claims of that Debtor;

(l)    All proceeds from Collateral of every kind and nature and in whatever form, including, without limitation, both cash and noncash proceeds resulting or arising from the rendering of services by that Debtor or the sale or other disposition by that Debtor of the Inventory or other Collateral;

2

(m)     All books and records relating to the conduct of that Debtor's business and other evidence of any Collateral, including, without limitation, the books and records relating to its Accounts Receivable; whether written, stored in computer memory, or stored on computer tape, disc or other electronic media, and any equipment containing such evidences and/or necessary for the access to such evidences, including computer programs and computer service bureau contracts;

(n)     All deposit accounts maintained by that Debtor with any bank, trust company, investment firm or fund, or any similar institution or organization;

(o)     All leases, installment purchase contracts and other agreements affecting the use or occupancy of, or conveying an interest in, any personal property or improvements owned or occupied by that Debtor or any real property owned or occupied by that Debtor now or in the future, wherever located, now or hereafter entered into, including but not limited to that Debtor's interest as lessee or sublessee (by assignment or otherwise) under leases of real property occupied by that Debtor now or in the future, and all rent and other payments payable under leases, installment purchase contracts and other agreements;

(p)     All awards or payments, including interest thereon, which may be made with respect to the Collateral or any real property owned or leased by that Debtor, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of the said right) or for any other entry to or decrease in the value of the Collateral or any real property owned or leased by that Debtor;

(q)     All proceeds of any and all unearned premiums on any insurance policies covering the Collateral, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Collateral or any real property owned or leased by that Debtor on the date hereof, and all proceeds arising from the sale or other disposition of any of the Collateral; and

(r)     The right, in the name and on behalf of that Debtor, to appear in and defend any action or proceeding brought with respect to the Collateral and to commence any action or proceedings to protect the interest of Lender in the Collateral.

1.3.     "Contract Rights" or "contract rights" means rights of a Debtor to payment under contracts not yet earned by performance and not evidenced by instruments or chattel paper.

1.4.     "Equipment" shall mean and include each Debtor's machinery, processors, tooling, equipment, office equipment, supplies customarily classified as equipment, furniture, trade fixtures, vehicles, motor vehicles, and all tangible personal property utilized in the conduct of that Debtor's business (but excluding therefrom "Inventory," as that term is defined in the Florida Uniform Commercial Code, as amended, ("Code")), and all replacements or substitutions therefor and all accessions thereto.

3

1.5. "Guaranty Agreement" means the Guaranty Agreement, dated the same date as this Security Agreement, made by Debtors in favor of Lender, as the same may be amended, modified, restated, or replaced from time to time.

1.6. "Inventory" shall include, without limitation, any and all goods held for sale or lease in each Debtor's business, as now or hereafter conducted, including new and used motor supplies, components, finished goods, and other tangible property now owned or hereafter acquired (including acquisitions by return, repossession or otherwise) and held for sale or lease or furnished under contracts of service or used or consumed in that Debtor's business, supplies customarily classified as inventory, all products of and accessions to Inventory and all documents (including documents of title under the Code) covering inventory and documents of title.

1.7. "Loan Documents" means all documents relating to the indebtedness evidenced by the Secured Note and shall include but not be limited to the Secured Note, the Guaranty Agreement, the Securities Pledge Agreement, and this Security Agreement, as such documents may be amended, modified, restated, extended, renewed, refinanced or replaced from time to time.

1.8. "Material Adverse Effect" means a material adverse effect on (a) the business, operations, properties, assets, condition (financial or otherwise), or prospects of the Debtors on a consolidated basis, or the ability of Debtors on a consolidated basis to perform their obligations under this Security Agreement or other Loan Documents, (b) the validity or enforceability of this Security Agreement or any of the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder, or (c) any liens or security interest created hereunder or the Collateral encumbered by such liens or security interest.

1.9. "Obligations" or "Obligation" means and includes the definition thereof set forth in Paragraph 2 hereof.

1.10. "Other Lender" means Intersection, LLC, a Delaware limited liability company, who has made a loan to Parent in the original principal amount of $750,000 as of the date of this Security Agreement on terms substantially similar to the terms of the Loan Documents.

1.11. "Other Lender Security Interest" means the liens and security interests in the Collateral of the Debtors granted to the Other Lender pursuant to the Security Agreement made by Debtors in favor of the Other Lender on the same date as this Security Agreement.

1.12. "Regions Bank Security Interest" means the liens and security interests in the Collateral of the Debtors granted to Regions Bank pursuant to the Security Agreement made by Debtors in favor of Regions Bank pursuant to the Regions Loan Agreement and related documents.

1.13. "Regions Loan Agreement" means the Loan Agreement between the Debtors and Regions Bank, an Alabama corporation, dated as of March 16, 2012.

1.14. "Secured Note" means the Secured Note, dated the same date as this Security Agreement, in the original face amount of $750,000 made by Parent in favor of Lender, as

4

the same may, from time to time, be amended, modified, restated, extended, renewed, refinanced, or replaced and in legal force and effect at the time.

1.15.   "Securities Pledge Agreement" means the Securities Pledge Agreement, dated the same date as this Security Agreement, made by Parent in favor of Lender, as the same may be amended, modified, restated, or replaced from time to time.

1.16.   All words and terms used in this Security Agreement other than those specifically defined in this Paragraph 1, and except as specifically otherwise defined elsewhere in this Security Agreement or in other Loan Documents (such definitions shall be applicable herein), shall be deemed to have the meanings accorded to them in the Code.  Time is of the essence of any term, requirement, covenant or payment date contained in this Security Agreement as well as to any note, indebtedness, or Obligation owed by each of the Debtors to the Lender.

1.17.   Notwithstanding any provision of the Code which could be construed as excluding from the provisions thereof the collateral assignment and security interest herein provided for in leases of any real or personal property now or in the future owned or occupied by any Debtor, or in improvements on such property, on the basis that such collateral assignment of and security interest in leases or in improvements on such real property constitutes an interest in real estate excluded from the scope of the Code, it is the specific intention of Debtors and Lender for themselves and their respective successors, assigns and all other parties claiming an interest through or under them, that the collateral assignment of, security interest in, and lien upon leases of any real or personal property owned, occupied or used by any Debtor, or in improvements on such real property, in favor of Lender herein provided for shall be deemed to be personal property (to the extent permitted by applicable law) and shall be governed and construed in accordance with the provisions of the Code, and as between Debtors and Lender for themselves and their respective successors and assigns as aforesaid, such leases shall be deemed to be general intangibles as defined in the Code and such improvements shall be deemed to be equipment as defined in the Code.  In furtherance but not in limitation of the collateral assignment and security interest herein provided for in leases, Debtors may execute specific assignments of rents and leases arising from real or personal property of each Debtor's now or in the future leased to third parties, and specific assignments of their respective lessee's interest in leases with respect to real or personal property now or in the future leased by each such Debtor from third parties.

**II.     Collateral Assignment and Security Interest**.

Each Debtor hereby collaterally pledges, assigns and grants to Lender a continuing security interest in, and lien on (i) all of that Debtor's Collateral, and (ii) in any and all other property of every kind or description in the name of that Debtor now or hereafter, for any reason or purpose whatsoever, whether in the possession or control of, or in transit to, Lender, or in which the Lender now or hereafter has a security interest and which secures any Obligations (as defined below) owed in any manner to Lender (whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due), for the prompt and unconditional payment and performance of all of the following, whether sole, joint or several, primary or secondary, direct or indirect, absolute or contingent, due or to become due, secured or not secured, now existing or hereafter arising, and all interest accrued thereon:

5

(a)     all indebtedness and obligations of Parent under the Secured Note including, but not being limited to, the outstanding principal balance of the Secured Note and interest accrued and unpaid thereon, and any renewals, enlargements, extensions, modifications, or replacements thereof, or additions thereto;

(b)     all other existing and future obligations of Debtors, and each Debtor, under this Security Agreement, the Guaranty Agreement, and the other Loan Documents, as the same may be amended from time to time, and any renewals, enlargements, extensions or modifications, or replacements thereof, or additions thereto;

(c)     any deficiency remaining upon enforcement of Lender's rights against all or any part of the Collateral; and

(d)     all costs, fees, disbursements, expenses, and charges under any of the foregoing including, but not limited to, reasonable attorneys' fees at trial and on appeal incurred by Lender in the collection or enforcement of any such obligation or the protection of any Collateral.

All such payment and performance obligations set forth herein shall collectively mean "Obligations" or "Obligation," for purposes of this Security Agreement.

**III.     Warranties, Covenants and Agreements.**

Each Debtor warrants, covenants, and agrees that:

3.1     Its principal place of business is located at the place set forth in the Principal Place of Business Exhibit to this Security Agreement, and Debtor's records concerning the Collateral of Debtor are and will be maintained at such address. Debtor shall not change its principal place of business nor the place where it maintains its records concerning its Collateral without first providing prior written notice to Lender.

3.2     The locations at which Debtor maintains its inventory are described in the Inventory Location Exhibit attached hereto and made a part hereof. Debtor agrees that Debtor will not maintain and/or store Debtor's inventory at any location other than such locations without first providing Lender advance written notice. Debtor further agrees Debtor will use its best efforts or require each landlord in which the Debtor's inventory is located to sign a landlord's waiver and consent form in a form acceptable to Lender.

3.3     That at the date hereof Debtor is (and as to Collateral that Debtor may acquire after the date hereof, will be) the lawful owner of that Collateral, and that such Collateral, and each item thereof, is, will be, and shall continue to be free of all restrictions, liens, encumbrances, collateral assignments or other right, title or interest (other than security interests granted to the Other Lender and to Regions Bank (including the Regions Bank Security Interest and the Other Lender Security Interest), credits, defenses, recoupments, set-offs or counterclaims whatsoever; Debtor has and will have full power and authority to collaterally assign and grant to Lender a continuing security interest therein and lien thereon; Debtor has not transferred, collaterally or absolutely assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell, pledge, encumber, subject to lien or grant any

6

security interest in any of Debtor's Collateral (or any of Debtor's right, title or interest therein) to any person other than Lender, Regions Bank, or the Other Lender; Debtor's Collateral is and will be valid and genuine in all respects; and that all Accounts Receivable arise out of legally enforceable and existing contracts, payable in accordance with their tenor; and, except for contract rights, no part of Debtor's Collateral (or the validity or enforceability by Lender thereof) is or shall be contingent upon the fulfillment of any agreement or condition whatsoever; and Debtor warrants and will defend Lender's right to and interest in the Collateral against all claims and demands of all persons whatsoever.

3.4    All monies due to Debtor under any Collateral of Debtor and all documents executed in connection with Debtor's Collateral are hereby collaterally assigned to the Lender. Upon the occurrence of an Event of Default under this Security Agreement or the other Loan Documents and the expiration of any applicable grace period and at the option of the Lender, all such monies shall be paid directly to the Lender and applied to the Obligations as herein defined, until such time as all of said Obligations shall have been paid in full.

3.5    That (a) except for the Regions Bank Security Interest and the Other Lender Security Interest, no payments due or to become due under any of Debtor's Collateral so giving rise to payments have been otherwise assigned; (b) no payments due or to become due on any date subsequent to the date of this Security Agreement have been collected in advance of the time when the same become due under the terms of any Collateral of Debtor so giving rise to payments, other than in the ordinary course of business; (c) any Collateral of Debtor constituting agreements, contracts, accounts and the like is valid and enforceable subject to applicable equitable principles, bankruptcy and other similar insolvency laws, and has not been materially altered, modified or amended in any material manner whatsoever; and (d) to Debtor's knowledge, the other party under any Collateral constituting agreements, contracts, accounts and the like is not in default under any of the terms, covenants or conditions thereof.

3.6    The Lender shall not be obligated to perform or discharge, nor does the Lender hereby undertake to perform or discharge, any obligation, duty or liability under any Collateral of Debtor constituting agreements, contracts and the like, or under or by reason of this Security Agreement. Debtor shall, and does hereby agree to indemnify Lender for and to hold Lender harmless from any and all liability, loss, damage or attorney fees which may or might be incurred by reason of this Security Agreement or for any other reason growing out of the operation of each Debtor's business, including but not limited to product liability suits, and from any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on Lender's part to perform or discharge any of the terms, covenants, or agreements contained in this Security Agreement, or in any Collateral constituting agreements, contracts and the like. Should Lender incur any such liability under or by reason of this Security Agreement or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees through and including the cost of any appeals, shall be secured hereby, and Debtor shall reimburse Lender therefor immediately upon demand. It is further understood that this Security Agreement shall not operate to place responsibility upon Lender for carrying out any of the terms and conditions of any Collateral constituting agreements, contracts and the like.

3.7    Debtor will maintain in force one or more policies of insurance covering public premises liability and Inventory, motor vehicles, Equipment and other insurable Collateral

7

of the Debtor against risks of fire (with customary extended coverage), sprinkler leakage, theft, products liability, spoilage, loss or damage and other hazards and risks customarily insured against by companies engaged in businesses similar to that of each Debtor or that Lender may require, in amounts and containing such terms as are customarily maintained by similar businesses, and in such form, for such periods, covering such hazards, and written by such companies as may be satisfactory to Lender. Any insurance policy obtained in accordance with this Section 3.7 will contain standard lender's loss payable clauses in favor of Lender, and directing any insurance proceeds to be payable first to Lender as its interest may appear in the event of loss and then to each such Debtor. Certificates of insurance evidencing such coverage shall be provided to Lender upon request. No loss shall be adjusted under an insurance policy without Lender's approval. All insurance policies shall provide that they may not be cancelled without first giving at least thirty (30) days' written notice of cancellation to Lender. In the event Debtor fails to provide evidence of the maintenance of such insurance policies satisfactory to Lender, Lender may, at its option, secure such insurance and charge the cost thereof to Debtors. At the option of the Lender, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations. Lender is hereby appointed Debtor's attorney-in-fact to endorse any draft or check which may be payable to Debtor in order to collect returned or unearned premiums or the proceeds of such insurance.

3.8     Debtor will at all times keep accurate and complete records of its Inventory, Accounts, Accounts Receivable, Equipment and other Collateral of Debtor and the proceeds thereof, and Debtor will submit to Lender, in a form satisfactory to Lender, such certificates, reconciliations and schedules relating to Inventory, Accounts, and Accounts Receivable and such other information concerning Debtor's business affairs, as Lender may from time to time require pursuant to the Secured Note and related Loan Documents.

3.9     Debtor will not during the term of this Security Agreement or any renewal or extension thereof, operate its respective business other than in the normal and customary course.

3.10     Lender shall have the right to call at Debtor's place or places of business, and without notice, hindrance or delay, to audit the Inventory and Equipment and audit, check and make extracts from the books, records, journals, orders, receipts, correspondence and other data relating to Debtor's Collateral assigned hereunder or to any other transactions between the parties hereto.

3.11     Except for the Regions Bank Security Interest and the Other Lender Security Interest, Debtor will not grant to any third person a security interest in any of Debtor's Collateral without the prior permission of Lender.

3.12     Debtor will immediately notify Lender of any loss or damage to, or material diminution in or any occurrence which would adversely affect the value of, the Inventory, the Equipment or other Collateral of Debtor.

**IV.     Proceeds**.

The Lender's security interest hereunder shall attach to all proceeds of all sales or other dispositions of Debtor's Inventory. Each Debtor agrees that each such Debtor will not sell, transfer or assign any or all of any such Debtor's interests in any Inventory except in the regular

course of business and upon terms which are customary or normal in each such Debtor's business. Each Debtor represents and warrants to Lender that its Inventory is not subject to any security interest, encumbrance or lien, or the claim of any third person and will not hereafter be subject to any security interest, encumbrance, lien or claim other than as granted to Lender under this Security Agreement, and the Regions Bank Security Interest and the Other Lender Security Interest.

**V.     Notice to Account Debtors and Contract Parties.**

Upon the occurrence of an Event of Default, without in any way waiving such default, Lender shall have the right, without further notice, to notify the account debtors obligated on any or all Accounts, Accounts Receivable, Contract Rights and chattel paper assigned or in which the Lender has a security interest hereunder, to make payment thereof or thereon directly to Lender, and to take control of all proceeds of any such Accounts Receivable, Contract Rights and chattel paper, whether such proceeds are cash or checks (hereinafter collectively called "cash proceeds") or negotiable instruments other than checks, or chattel paper or other proceeds (hereinafter collectively called "non-cash proceeds"), with full power upon the occurrence of an Event of Default hereunder or under the Loan Documents, to settle or compromise disputed claims on such Accounts, Accounts Receivable, Contract Rights and chattel paper. Until such time as Lender shall elect to exercise such right by causing Lender to mail to Debtor written notice thereof, each Debtor is authorized, as agent of Lender, to collect and enforce each Debtor's' Accounts, Accounts Receivable, Contract Rights and chattel paper. The costs of such collection and enforcement, including attorneys' fees and out-of-pocket expenses, shall be borne solely by Debtor, whether the same are incurred by Lender or Debtor.

**VI.     Sale in the Ordinary Course of Business.**

6.1     So long as Debtors are not in default hereunder, Debtors shall have the right, in the regular course of business and upon terms which are customary or normal in each such Debtor's business, to process, sell, service, and collect receipts of such Debtor's Inventory. Lender's security interest shall attach to all cash proceeds and non-cash proceeds of such Debtor's Accounts, Accounts Receivable, Contract Rights, chattel paper and Inventory, including without limitation, the full amount of all cash and non-cash proceeds deposited in any deposit accounts of such Debtor and commingled with other funds.

6.2     Upon the occurrence of an Event of Default hereunder and after notice from Lender, each Debtor shall deliver to Lender all non-cash proceeds received by that Debtor, with such endorsements and assignments as may be necessary to transfer title thereto to Lender, not later than the business day following their receipt; and shall deliver to Lender not later than the business day following their receipt all cash proceeds. Pending such delivery or deposit, each Debtor agrees that it will not commingle any such collection with any of its other funds or property, but will hold them separate and apart therefrom and upon an express trust for Lender until delivery to Lender.

6.3     Notwithstanding anything to the contrary in this Security Agreement, in the event that for any period of time the Lender does not elect to exercise its rights under the foregoing

9

Section 6.2, each of the Debtors may retain collections on Accounts Receivable and cash sales or other dispositions of Inventory during such period.

6.4     Upon the Lender's election to enforce its rights pursuant to Section 6.2 hereof, all cash proceeds delivered to Lender pursuant to Section 6.2 and all cash proceeds realized from the collection by Lender or Debtors of non-cash proceeds delivered or collected pursuant to Section 6.2, shall be allocated by Lender, at least once a week, for application in whole or in part, against the Obligations, the order and method of such application to be first to costs and expenses of Lender, then to interest then accrued and then to principal.

## VII.    Possession of Collateral.

Upon the Lender's demand, and the occurrence of an Event of Default hereunder, each Debtor shall deliver possession of that Debtor's Collateral to Lender. Debtors shall pay all costs incurred in transferring possession of the Collateral to Lender and for storage of the Collateral while in the possession of Lender. Debtors agree that in the event Debtors fail to pay such costs, Lender may do so for Debtors and the cost thereof shall be considered part of the Obligations hereunder.

## VIII.   Attorney-In-Fact.

Each Debtor hereby irrevocably constitutes and appoints Lender as that Debtor's true and lawful attorney, with full power of substitution, at the sole cost and expense of the Debtors, but for the sole benefit of the Lender, to (a) convert the Collateral of that Debtor into cash, including, without limitation, completing the processing of work in process, and the sale (either public or private) of all or any portion or portions of the Inventory and other Collateral of that Debtor, (b) enforce the collection of each Debtor's Collateral, either in the name of Parent, Lender, or the Debtor, including, without limitation, executing releases, compromising or settling with any account debtors and prosecuting, defending, compromising and releasing any action relating to that Debtor's Collateral, (c) receive, open and dispose of all mail addressed to that Debtor, and to take therefrom any remittances or proceeds of Collateral in which Lender has a security interest, and accept receipt for, and endorse all receipts, checks, notes, instruments, agreements and letters; (d) notify Postal Service authorities to change the address for delivery of mail addressed to any Debtor to such address as Lender shall designate; (e) sign and endorse the name of each such Debtor on, and to receive as secured party any of that Debtor's Collateral consisting of, invoices, Schedules of Collateral, and documents of title of the same or different nature relating to that Debtor's Collateral; (f) sign the name of each such Debtor on any notice or verification of the Accounts Receivable to the account debtors; and (g) sign and file or record on behalf of each such Debtor any financing or other statement in order to perfect or protect Lender's security interest, and do all acts and things which Lender may deem necessary to perfect and continue perfected the continuing security interest created by this Security Agreement. Lender shall not be obligated to do any of the acts or exercise any of the powers hereinabove authorized, but if Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to any Debtor or anyone else except for gross negligence or willful misconduct in bad faith. All powers conferred upon Lender by this Security Agreement, being coupled with an interest, shall be irrevocable so long as any Obligations of Debtors, or any Debtor, to Lender shall remain unpaid.

Under the authority of this Section, whenever Lender deems it desirable after the occurrence of an Event of Default that any legal action be instituted with respect to any Collateral of a Debtor or that any other action be taken in an attempt to effectuate collection of any Collateral of a Debtor, Lender may reassign the item in question to that Debtor (and if Lender shall execute any such reassignment, it shall automatically be deemed to be without recourse to Lender in any event) and require that Debtor proceed with such legal or other action at that Debtor's sole liability, cost and expense, in which event all amounts collected by that Debtor on such item shall nevertheless be subject to the provisions of this Security Agreement.

## IX. Preservation of Collateral.

9.1     Each Debtor agrees that it assumes full responsibility for preservation of the Collateral of that Debtor, including maintaining the Debtor's Collateral in good condition and repair, ordinary wear and tear excepted, and taking any steps necessary to preserve any right of that Debtor or Lender in it against prior parties, including paying and discharging, or causing to be paid and discharged, all taxes, levies, and other impositions levied thereon, and paying or causing to be paid any rent or mortgage payments due on premises where the Collateral is held or may be held.

9.2     Lender will have exercised reasonable care of any Collateral of a Debtor in its possession if it takes such action for that purpose as that Debtor shall reasonably request in writing; but no omission to do any act requested by that Debtor shall be deemed a failure to exercise reasonable care, and no omission to comply with any request of that Debtor shall of itself be deemed a failure to exercise reasonable care; provided, however, that Lender shall not be required in any manner to make any demand or inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claims, or to take any other action to collect or enforce the payment of any amount which may become due or payable on any Account Receivable or security therefor.

9.3     Notwithstanding the foregoing, Lender may, at its option, from time to time, discharge any taxes, liens, or encumbrances on any of the Collateral, pay any rent payments due on premises where the Collateral is held, or take any other action that Lender may deem proper to repair, maintain or preserve any of the Collateral, and Debtors will pay to Lender on demand all amounts so paid or incurred by Lender.

## X. Financing Statements.

Debtors will pay all costs of filing any financing, continuation, or termination statements with respect to the security interest created by this Security Agreement. Each Debtor will execute and deliver to Lender any writings and do all things necessary or reasonably requested by Lender to carry into effect the provisions and intent of this Security Agreement, or to vest more fully in or assure to Lender (including, without limitation, all steps to create and perfect) the continuing security interest in the Collateral granted to Lender by this Security Agreement or to comply with applicable statutes or law and to facilitate the collection of the Collateral. A carbon, photographic or other reproduction of this Security Agreement or any financing statement executed pursuant to the terms hereof shall be sufficient as a financing statement for the purpose of filing with the appropriate authorities.

04760-00100 825377 v1

## XI.     Event of Default.

Each of the following acts, events, or omissions shall constitute an "Event of Default" under this Security Agreement:

11.1     Payment of Obligations.  Parent shall fail to make any payment of principal, interest, or other amount due on the Secured Note.

11.2     Other Defaults Under the Loan Documents.  A default or event of default occurs under any of the other Loan Documents, other than Parent's failure to make any payment of principal, interest, or other amount due on the Secured Note.

11.3     Regions Bank Default.  A default or Event of Default as defined in the Regions Loan Agreement, and such default or Event of Default continues beyond the expiration of any applicable grace or cure period.

11.4     Other Lender Default.  A default or Event of Default as defined in either the secured note delivered by Parent to the Other Lender on the date of this Security Agreement, in the original principal amount of $750,000, and such default or Event of Default continues beyond the expiration of any applicable grace or cure period (collectively, the "Other Lender Notes").

11.5     Payment, Performance, or Default of Other Monetary Obligations.  Any Debtor fails to make payment on any contract obligation in excess of $10,000.00 or of principal or interest on any indebtedness in excess of $10,000.00 other than that created under the Secured Note, the Other Lender Notes, or the Loan Agreement, if such failure, default, or event of default continues beyond the expiration of any applicable grace or cure period, or any Debtor fails to fully and promptly perform any other obligation, agreement, term, or condition contained in any agreement under which any such other indebtedness is created or there is otherwise a default or event of default thereunder if such failure, default, or event of default continues beyond the expiration of any applicable grace or cure period.

11.6     Covenants or Defaults of Other Agreements.  Any Debtor fails to promptly perform when due any agreement, covenant, term, or condition binding on it that is contained in any lease, contract, or other agreement to which it is a party or in respect of which it is obligated, other than the Secured Note, the Other Lender Notes, or the Loan Agreement, and other than those containing monetary obligations (as described in Section 11.5), but all of which must have a contract value in excess of $10,000.00 for there to be a default or event of default thereunder, and such failure, default, or event of default continues beyond the expiration of any applicable grace or cure period.

11.7     Liquidation; Dissolution; Bankruptcy; Etc.  Any Debtor (a) liquidates, dissolves, the business of any such Debtor is suspended, any Debtor files or commences a voluntary petition, case, proceeding, or other action seeking reorganization, arrangement, readjustment of its debts, or any other relief under any existing or future law of any jurisdiction, domestic or foreign, state or federal, relating to bankruptcy, insolvency, reorganization, or relief of debtors, or any Debtor takes any other action indicating its consent to, approval of, or acquiescence in, any such petition, case, proceeding, or other action seeking to have an order for relief entered with respect to such Debtor or its debts, (b) applies for, or consents to or acquiescence in, the

appointment of a receiver, trustee, custodian, or other similar official for such Debtor or for all or a substantial part of such Debtor's property, (c) makes an assignment for the benefit of creditors; (d) is unable to pay its debts as they mature or admits in writing its inability to pay its debts as they mature, or (e) takes any action with regarding to its property in order to hinder, delay, or defraud creditors.

11.8    Involuntary Bankruptcy, Etc.  An involuntary petition, case, proceeding, or other action is commenced against any Debtor under the Bankruptcy Code or seeking reorganization, arrangement, readjustment of a Debtor's debts, or any other relief under any existing or future law of any jurisdiction, domestic or foreign, state or federal, relating to bankruptcy, insolvency, reorganization, or relief of debtors; a receiver, trustee, custodian, or other similar official is involuntarily appointed for any Debtor or for all or a substantial part of any Debtor's property or assets; or any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or a substantial part of any Debtor's assets or property results in the entry of an order for such relief; and any of the foregoing continues for sixty (60) days without being vacated, discharged, stayed, bonded, or dismissed.Judgments.  A judgment is entered against any Debtor for the payment of damages or money in excess of $250,000.00, if the same is not discharged or if a writ of execution or similar process is issued with respect thereto and is not stayed within the time allowed by law for filing notice of appeal of the final judgment.

11.10    Attachment, Garnishment, Liens Imposed by Law.  A writ of attachment or garnishment is issued against, or a lien is imposed by operation of law on, any property of any Debtor, if the amount of the claim or the value of the affected property is in excess of $250,000.00, if the lien is not discharged within thirty (30) days after it has attached.Existence, Transfer of Property.  Any intentional act or omission (formal or informal) of any Debtor or the Debtors' respective officers, directors, shareholders, members, or managers leading to, or resulting in, the termination, invalidation (partial or total), revocation, suspension, interruption, or unenforceability of its existence, rights, licenses, franchises, or permits, which results or could reasonably result in a Material Adverse Effect or the transfer or disposition (whether by sale, lease, or otherwise) to any Person, other than a Debtor, of all or a substantial part of its property.

11.12    Material Adverse Change.  The Lender determines that a material adverse change has occurred in the consolidated financial condition of the Debtors from the condition in existence on the date hereof.

11.13    Unenforceability of Documents, Invalidity of Security Interest and Liens; Transfer of Collateral.

(a)    For any reason after the execution and delivery thereof, any Loan Document ceases, in whole or in part, to be the effective, legal, valid, binding, and enforceable agreement of the Person party thereto (except in accordance with its terms);

(b)    Any Person contests in any manner the effectiveness, validity, legally binding nature, or enforceability of any of the Loan Documents to which it is a party; or

(c)    Any Loan Document or other instrument delivered pursuant thereto that creates, or was intended to create, a security interest, mortgage, or other lien to secure the

Obligations ceases to be in full force and effect, or the liens intended to be created thereby cease to be or are not valid and perfected liens subject to no other liens except as expressly permitted herein.

11.14 <u>Invalidity of Guaranty</u>. For any reason after the execution and delivery thereof, the Guaranty Agreement, or any document or other instrument that gives rise to or was intended to give rise to a guaranty of the Secured Note or other Obligations ceases to be in full force and effect, or any party executing such document or other instrument as a guarantor contests the validity or enforceability of the guaranty or denies that it has further liability with respect to any portion thereof.

11.15 <u>Breach of Letter Agreement</u>. The Parent fails to perform promptly when due any agreement, covenant, term, or condition binding on it that is for the benefit of the Lender, Jonathan A. Yob, or the affiliates of either of them, and is contained in that certain letter agreement, dated December 4, 2012, by and among the Lender, Jonathan A. Yob, the Parent, and the Other Lender.

## XII.   Time of the Essence.

Time is of the essence with respect to any term, requirement, covenant, or payment date contained in this Security Agreement or any other Loan Document.

## XIII.   Remedies.

13.1   The Lender is hereby authorized, at its election, at any time or times after an Event of Default has occurred, and without any further demand or notice except to such extent as notice may be required by applicable law, to sell or otherwise dispose of all or any of the Collateral at public or private sale; and Lender may exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it or them by applicable law, all as Lender may determine.

13.2   If notice of a sale or other action by Lender is required by applicable law, each Debtor agrees that ten (10) days' written notice to such Debtor, or the shortest period of written notice permitted by such law, whichever is larger, shall be sufficient, and that to the extent permitted by such law, Lender, its officers or its attorneys may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations, and any sale (public or private) shall be free from any right of redemption, which each Debtor hereby waives and releases. No purchaser (other than Lender or Lender's agents) at any sale (public or private) shall be responsible for the application of the purchase money.

13.3   The Lender shall have the unrestricted right from time to time after the occurrence of an Event of Default to apply (or to change any applications already made) the proceeds of any of the Collateral to the Obligations.

13.4   Any balance of the net proceeds of sale remaining after paying all Obligations of the Debtors to Lender, and all costs and expenses of finishing work in process, processing, completion, installation, collection, storage, custody, sale and delivery of the

14

Inventory, collection of the Accounts Receivable, performance of contract rights and other similar Collateral, sales of the Equipment and all other expenses, including, without limitation, reasonable attorneys' fees, shall be returned to Debtors or to such other party as may be legally entitled thereto; and if there is a deficiency, Debtors shall be responsible for the same, with interest at the Default Rate set forth in the Secured Note.

## XIV. Enforcement.

Lender shall have the right at all times to enforce the provisions of this Security Agreement in strict accordance with the terms hereof, notwithstanding any conduct or custom on the part of Lender in refraining from so doing at any time or times. The failure of Lender at any time or times to enforce its rights under such provisions strictly in accordance with the same shall not be construed as having created a custom in any way or manner contrary to the specific provisions of this Security Agreement or as having in any way or manner modified or waived the same. All rights and remedies of Lender are cumulative and concurrent, and the exercise of one right or remedy shall not be deemed a waiver or release of any other right or remedy. Nothing herein contained shall preclude Lender at any time from enforcing the Obligations in accordance with their terms.

## XV. Waiver.

Each Debtor hereby waives presentment, demand for payment, notice of dishonor, protest and notice of protest of the Collateral of that Debtor, notice of maturity, notice of non-payment, and any and all other notices or demands in connection herewith. Each Debtor further waives any right to assert in any bankruptcy proceeding in which any Debtor is a debtor (i) that the Collateral should be valued by any method other than liquidation value where Lender seeks "adequate protection" or relief from the automatic stay under the Bankruptcy Code, (ii) that the Lender's security interest in cash proceeds of Collateral is limited to any amount less than the actual amount of such proceeds, (iii) use of cash proceeds of Collateral without the written consent of Lender unless authorized by the bankruptcy court in which such bankruptcy is pending, after notice and a hearing, and (iv) use of cash proceeds of Collateral unless Lender is granted an additional substitute lien in other property to the extent such cash proceeds are used by any Debtor.

## XVI. Term and Termination.

The term of this Security Agreement shall commence with the date hereof and end upon payment, discharge, and satisfaction of the Obligations in full.

## XVII. Governing Law.

The laws of Florida shall govern the construction of this Security Agreement and the rights and duties of the parties hereto.

## XVIII. Benefit.

This Security Agreement shall inure to the benefit of Lender's successors and assigns and shall be binding on each of Debtor's successors and assigns.

04760-00100 825377 v1

### XIX.  Loan Documents.

This Security Agreement is executed together with the other Loan Documents, and all amendments and renewals thereof, all of the terms and conditions of which are incorporated herein. Default in any of the terms and conditions hereof shall constitute a default thereunder, and default in any of the terms and conditions thereof shall constitute a default hereunder. The rights and remedies provided in this Security Agreement, the Secured Note, the Guaranty Agreement, and the other Loan Documents are cumulative and not exclusive of any rights or remedies provided by law.

### XX.  Assignment.

This Security Agreement is not assignable (by operation of law or otherwise) by Debtor without the advance written approval of Secured Party, which it may withhold in its sole discretion. The assignment of this Security Agreement by Debtor without the advance written approval of Secured Party will constitute a Default by Debtor and will be invalid and unenforceable as to Secured Party. Secured Party may assign its rights and interests under this Security Agreement, and if Secured Party assigns those rights and interests, Debtor shall render performance under this Security Agreement to the assignee. Debtor waives and will not assert against any assignee any claims, defenses, or set-offs that Debtor could assert against Secured Party, except those defenses that cannot by law be waived.

### XXI.  Intercreditor Agreement.

For the avoidance of doubt, Lender agrees and acknowledges that all amounts payable under the Secured Note are subject to the provisions of that certain Intercreditor and Subordination Agreement, dated the same date as this Security Agreement, by and among Lender, Regions Bank, and the Other Lender (the "Intercreditor Agreement"), and that Lender shall not seize any collateral or take any action to enforce its rights under the Secured Note or this Security Agreement except as provided in the Intercreditor Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

04760-00100 825377 v1

**IN WITNESS WHEREOF**, the parties hereto have caused these presents to be duly executed to be effective as of the day and year first above written.

CRS HOLDING OF AMERICA LLC,
a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING SYSTEMS, LLC,
a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


DYNAMIC LEASING LLC,
a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


BARGAIN COMPUTER PRODUCTS OF YBOR
CITY, LLC, a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING SYSTEMS OF NORTH
FLORIDA, LLC, a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

04760-00100 825377 v1

CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel

CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel

CREATIVE RECYCLING SERVICES, LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel

CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel

CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel

18

CREATIVE RECYCLING SYSTEMS OF
TENNESSEE, LLC, a Florida limited liability
company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING TECHNOLOGIES,
LLC, a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING TECHNOLOGIES II,
LLC, a Florida limited liability company

By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING SYSTEMS OF
PENNSYLVANIA, LLC, a Florida limited liability
company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING SYSTEMS OF
LOUISIANA, LLC, a Florida limited liability
company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

04760-00100 825377 v1

CREATIVE RECYCLING SOLUTIONS, LLC, a
Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

CREATIVE RECYCLING TECHNOLOGIES III,
LLC, a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

ENVIRONMENTAL SERVICES SALES &
MARKETING, LLC, a Florida limited liability
company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


CREATIVE RECYCLING SYSTEMS OF
ILLINOIS, LLC, a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel


PLANET GADGET USA, LLC a Florida limited
liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

04760-00100 825377 v1

GREENROCK RARE EARTH RECOVERY, LLC,
a Florida limited liability company


By:_____
    Manny Alvare, as its
    Secretary and General Counsel

## Inventory Location Exhibit

## Principal Place of Business Exhibit

# EXHIBIT C

| | | September Month | October Month | Total |
|---|---|---:|---:|---:|
| **Cash Receipts** | | | | |
| **Total Cash Receipts** | | 850,000 | 950,000 | 1,800,000 |
| | | | | |
| **Cost of Goods Sold** | | | | |
| | Direct labor | 186,989 | 274,454 | 461,444 |
| | Direct taxes | 46,546 | 68,318 | 114,864 |
| | Direct benefits | 29,860 | 25,220 | 55,080 |
| | Temporary labor | - | - | - |
| | Logistics | - | - | - |
| | Materials | 150,000 | 150,000 | 300,000 |
| | Transfers | 60,000 | 10,000 | 70,000 |
| | Truck Rentals | - | - | - |
| | Freight - Other | 75,000 | 75,000 | 150,000 |
| | Packaging | 10,000 | 10,000 | 20,000 |
| | Fuel | 30,000 | 30,000 | 60,000 |
| | Recycling Fees | 2,000 | 2,000 | 4,000 |
| | Disposal - Other | 2,000 | 2,000 | 4,000 |
| | Propane | 2,000 | 2,000 | 4,000 |
| | Transport Foreign | - | - | - |
| | Treatment Charges | - | - | - |
| | Transport - Glass Recycling | 300,000 | 200,000 | 500,000 |
| **Cost of Goods Sold** | | 894,395 | 848,993 | 1,929,915 |
| | | | | |
| **Net Cash Flow Margin** | | (44,395) | 101,007 | (129,915) |
| | | | | |
| | | | | |
| **Selling, General & Admin. Exp** | | | | |
| | Salaries & Wages | 217,821 | 245,269 | 463,089 |
| | Employee Staying Bonus | 30,000 | 30,000 | 60,000 |
| | Benefits | 15,530 | 8,060 | 23,590 |
| | Facility Lease | - | - | - |
| | Insurance | 40,000 | 40,000 | 80,000 |
| | Temp Labor | - | - | - |
| | Payroll Taxes | 61,688 | 68,521 | 130,209 |
| | Travel | - | - | - |
| | Professional Fees | - | - | - |
| | Internet | 15,000 | 15,000 | 30,000 |
| | Electric | 5,000 | 5,000 | 10,000 |
| | Offices Supplies | 500 | 500 | 1,000 |
| | Sponsorships/Memberships | - | - | - |
| | Ad / Collateral Materials | - | - | - |
| | Warehouse Supplies/Tools | 1,000 | 1,000 | 2,000 |
| | Credit Card & Bank Fees | 10,000 | 10,000 | 20,000 |
| | Vehicle/Truck Maintenance | - | - | - |
| | Equipment Rental | - | - | - |
| | Repairs & Maintenance - Equipment | - | - | - |
| | Telephone & Fax | 5,000 | 5,000 | 10,000 |
| | Accounting & Audit Fees | - | - | - |
| | Legal Expense | - | - | - |
| | Quality Certification Expense | - | - | - |
| | Payroll Service Expense | 3,000 | 5,000 | 8,000 |
| | Cell Phone Expense | - | - | - |
| | Professional Fees - Other | - | - | - |
| | Licenses & Fees | 60,000 | - | 60,000 |
| | Consulting | - | - | - |
| | Natural Gas | - | - | - |
| | Listing Fees | 9,000 | 9,000 | 18,000 |
| | Security | 1,000 | 1,000 | 2,000 |
| | Sales & Commissions | - | - | - |
| | Uniforms | - | - | - |
| | Fuel - Admin | - | - | - |
| | Bad Debt Expense | - | - | - |
| | Collection Expense | - | - | - |
| | Corporate Lease | - | - | - |
| | Vehicle Lease | - | - | - |
| | Water/Sewerage | 500 | 500 | 1,000 |
| | Repairs & Maintenance - Facility | - | - | - |
| | Receiver and Staff Fee | 70,000 | 40,000 | 110,000 |
| | Receiver's Attorney Fee | 120,000 | 50,000 | 170,000 |
| | Filing Fees | 30,000 | - | 30,000 |
| | Facility Move | - | 35,000 | 35,000 |
| | All Other | - | - | - |
| **Total SG&A** | | 695,039 | 568,850 | 1,432,834 |
| | | | | |
| **Operating Cash Flow (Deficit)** | | ($739,434) | ($467,842) | ############ |
| | | | | |
| **Cash Infusion** | | $750,000 | $250,000 | $1,000,000 |
| | | | | |
| **Change in Cash** | | 10,566 | (217,842) | (207,276) |
| **Beginning Balance** | | 200,000 | 210,566 | 200,000 |
| **Ending Balance** | | 210,566 | (7,276) | (7,276) |