UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

CRS HOLDING OF AMERICA, LLC,                    Case No. 8:14-bk-10142-KRM
et al, [1]                                      Chapter 11
               Debtor,
_____/

## DEBTOR'S EMERGENCY MOTION FOR
## AUTHORITY TO OBTAIN POST-PETITION FINANCING

> *Emergency Relief Requested: For the reasons set forth more particularly in the Motion and in the Certificate of Necessity filed in support of same, the Debtor requests that the Court conduct a hearing on this Motion at the earliest opportunity and not later than September 3, 2014, and expects that such hearing will last no more than 30 minutes.*

Comes now Debtor, CRS HOLDING OF AMERICA, LLC ("CRS Holding"), together with its twenty-one subsidiary affiliate debtors (collectively, "CRS" or "Debtors"), pursuant to 11 U.S.C. § 364(d), Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, and applies to this Court for authority to obtain post-petition financing, and in support thereof, CRS states as follows:

1.      That the voluntary petition in the above-styled case, and each of the affiliated cases, was filed on August 29, 2014 **("the Petition Date")**.

2.      That CRS is the debtor-in-possession in the above-styled case.

3.      That CRS Holding, in conjunction with its subsidiaries, operates a full service electronics recycling business, providing e-waste recycling services to consumers, businesses and governmental entities.

4.      To avoid duplicative pleading, the Debtors incorporate by reference the background facts set forth in the Debtor's Chapter 11 Case Management Summary filed in the

---

[1] This Motion for Authority to Obtain Post-Petition Financing is applicable to all above-identified Debtors but is only being filed in the CRS Holding case pending a ruling on the Motions for Joint Administration filed in each Debtors' case.

above-styled case.

**Relief Requested**

5.      By this Motion, the Debtors seek this Court's approval of a post-petition Debtor-In-Possession credit facility on substantially the terms outlined herein **("Credit Facility")**, in order to pay, among other things, ordinary course operating expenses and other administrative expenses consistent with the Debtors' overall objective of stabilizing the business for likely sale pursuant to a plan of reorganization.

6.      The Companies request this Court's approval of a Credit Facility of up to One Million and 00/100 Dollars ($1,000,000.00) to be provided by Regions Bank **("Regions" or "Lender,"** as appropriate).   Attached hereto as **Exhibits "A"** and **"B"**, respectively, are copies of the proposed Promissory Note **("the Note")** and the proposed Debtor-In-Possession Credit Agreement **("the Agreement")** that the Companies are prepared to execute upon approval of the Credit Facility by this Court.

7.      The material provisions of the Credit Facility include the following:

    a.   <u>Interest Rate</u>:  Prime Rate, as defined in the documents plus 5% (see page 1 of the Note and Sec. 2.05 of the Agreement).

    b.   <u>Maturity</u>:  Generally 60 – 90 days from the Petition Date (see Sec. 2.01(c) of the Agreement).

    c.   <u>Events of Default</u>:  The potential events of default are numerous, and are set forth in Section 7 of the Agreement.  In general, however, events of default appear to be focused on the prompt filing and subsequent approval of (i) a motion to sell all or substantially all of the Companies assets pursuant to 11

U.S.C. Sec. 363 **("the Sale Motion")**, and (ii) a Chapter 11 Plan.

d. <u>Liens</u>:  The Agreement provides that payment of the Credit Facility will be secured by a first priority security interest in all of the Companies' assets, pursuant to 11 U.S.C. Sec. 364(c), (d).  See Sec. 2.12 of the Agreement.

e. <u>Borrowing Limits</u>:  The Credit Facility is limited to One Million and 00/100 Dollars ($1,000,000.00).

f. <u>Borrowing Conditions</u>:  There are multiple conditions to the borrowing(s), both financial and non-financial in nature.  Those conditions are described in Sec. 2.02 of the Agreement.  Additionally, Sec. 2.03 of the Agreement requires that the Credit Facility be utilized consistent with the Budget attached hereto as **Exhibit "C"**.

g. <u>Deadlines</u>:  The Credit Facility establishes certain deadlines for, among other things, (i) the filing of the Sale Motion, (ii) the approval of the Sale Motion, and (iii) the filing of a Chapter 11 Plan.  See Sec. 2.01 of the Agreement.

h. <u>Causes of Action</u>:  The Credit Facility does not provide for a release, waiver or limitation on any claim or cause of action belonging to the estate or the trustee.  It does, however, prohibit the use of the proceeds of the Credit Facility for professional fees and expensed for pursuing certain claims against Regions.  See Sec. 2.12(c) of the Agreement.

## Basis for Relief

8.      As a result of the financial circumstances outlined in the Debtor's Chapter 11 Case Management Summary, the Companies are in need of additional debt financing in order to maximize the value of the Estate and the ultimate return to creditors; specifically to operate the

company pending the filing and approval of the Sale Motion.

9.      The Credit Facility is necessary because, without it, the Debtor will be unable to fund its immediate-term operating needs and, more importantly, will be unable to stabilize its business operations for likely ultimate sale.

10.     Additionally, the Debtor has determined that it is in the best interest of the Debtor and all of its creditors to obtain financing from Regions, which is willing to lend to the Debtor on more favorable terms than any third party lender would be willing to offer given Regions familiarity with the Debtor's operations and those of its affiliates.

11.     The Companies were unable to obtain unsecured or secured credit other than from Regions.

12.     The Companies will file a proposed Order on this Motion in advance of the hearing on same.

WHEREFORE, the Debtor respectfully requests that this Court enter an Order (i) granting this Motion, (ii) approving the Credit Facility on an interim and final basis, and (iii) granting such other and further relief as this Court deems just and appropriate.

**SHUMAKER, LOOP & KENDRICK, LLP**

/s/ Hugo S. deBeaubien
**JAY B. VERONA, ESQ.**
Florida Bar No. 352616
jverona@slk-law.com
**HUGO S. deBEAUBIEN, ESQ.**
Florida Bar No. 058100
bdebeaubien@slk-law.com
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
Phone: 813-229-7600
Fax:  813-229-1660
*Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014, a true and correct copy of the foregoing **Motion** was served via CM/ECF Electronic Noticing or US Mail on the following:

| | |
|---|---|
| Regions Bank<br>c/o Grayson Hall, Jr., as President & CEO<br>1900 Fifth Avenue North<br>Birmingham, AL 35203 | Regions Equipment Finance Co.<br>c/o Grayson Hall, Jr., as President & CEO<br>1900 Fifth Avenue North<br>Birmingham, AL 35203 |
| Regions Bank<br>c/o Keith Fendrick, Esq.<br>Holland & Knight, LLP<br>100 North Tampa St.<br>Suite 4100<br>Tampa, FL 33602 | Regions Equipment Finance Co.<br>c/o Keith Fendrick, Esq.<br>Holland & Knight, LLP<br>100 North Tampa St.<br>Suite 4100<br>Tampa, FL 33602 |
| JY Creative Holdings, Inc.<br>c/o Providence Family Offices, LLC, as Registered Agent<br>202 S. Rome Ave, #150<br>Tampa, FL 33606 | Intersection, LLC<br>c/o Registered Office Service Company as Registered Agent<br>203 NE Front St. Suite 101<br>Milford, DE 19963 |
| JY Creative Holdings, Inc.<br>c/o Nathan Carney, Esq.<br>400 N. Ashley Drive<br>Suite 2600<br>Tampa, FL 33602 | Intersection One, LLC<br>Jeffrey T. Kucera, Esq.<br>K&L Gates LLP<br>200 S. Biscayne Blvd.<br>Suite 3900<br>Miami, FL 33131 |
| Office of the United States Trustee<br>501 E. Polk St.<br>Suite 1200<br>Tampa, FL 33602 | 20 Largest / LBR 1007-2 Matrix |
| UnionBanCal Equities, Inc., Member<br>c/o Registered Agent Solutions<br>1220 South Street, Suite 150<br>Sacramento, CA 95811 | UnionBanCal Equities, Inc., Member<br>445 So. Figueroa St., 21st Floor<br>Los Angeles, CA 90071 |

/s/ Hugo S. deBeaubien
**Attorney**

# EXHIBIT A

**PROMISSORY NOTE**

**Effective Date:**        September ___, 2014

**Amount of Note**:        $1,000,000.00

**Maturity Date:**        See DIP Loan Agreement

FOR VALUE RECEIVED, the undersigned ("Maker") does hereby covenant and promise to pay to the order of REGIONS BANK, an Alabama banking corporation, or its successors or assigns ("Lender"), at 100 North Tampa Street, Suite 3100, Tampa, Florida 33602, or at such other place as Lender may designate to Maker in writing from time to time, in legal tender of the United States, the principal sum of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) or so much thereof as shall be advanced pursuant to the Secured, Super Priority Debtor-in-Possession Credit Agreement, as amended or modified from time to time (the "DIP Loan Agreement"), together with all accrued interest thereon, which shall be payable as follows:

> (i)     Maker shall remit to Lender payments of accrued interest due and owing on the outstanding principal balance of this Note, which shall be payable in accordance with the DIP Loan Agreement at the Maturity Date defined therein;

> (ii)     The outstanding principal balance of this Note, together with all accrued interest owing shall be paid in full on the Maturity Date; and

> (iii)     Notwithstanding anything to the contrary in this Note or in the Loan Agreement, Maker agrees and acknowledges that any advances that are made under this Note shall be made by Lender, at Lender's sole discretion. Maker acknowledges that Lender has no obligation to make any advances under this Note unless Lender approves any such advances in Lender's sole discretion.

**Interest Rate:**

Principal outstanding under this Note shall bear interest at a variable rate of interest equal to the Prime Rate plus five percent (5.0%) per annum. The interest rate on this Note is subject to change from time to time based on changes in the Prime Rate. The term "Prime Rate" means the per annum rate which the Lender publicly announces from time to time to be its prime lending rate, as in effect from time to time. The Lender's prime lending rate is a reference rate and does not necessarily represent the lowest or best rate charged to customers.

Payments received after Lender cut-off times established from time to time or on weekends or bank holidays will be credited as of the next Business Day.

As used in this Note, the following capitalized terms will have the meanings indicated:

"Business Day" means a day on which the office of the Lender at which payments under this Note are to be made is open for business.

In all cases, interest shall be calculated at the rate of 1/360 of the annual rate of interest for each day that principal is outstanding (i.e., interest will accrue and be paid on the actual number of calendar days elapsed from the date of each advance).

**Prepayment**:

Maker may prepay this Note, in whole or in part, any time hereafter without penalty.

**Security:**

This Note is secured by a pledge of all assets of Maker in accordance with the terms and conditions of the DIP Loan Agreement. Any capitalized terms not defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

**Default Interest Rate**:

Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Agreement, the principal outstanding under this Note shall bear interest until paid at the "default interest rate" which shall be a rate equal to four percent (4.0%) per annum in excess of the interest rate that is otherwise payable under this Note.

**Late Charges**:

The Lender may collect a late charge not to exceed an amount equal to five percent (5%) of any installment of principal and/or interest which is not paid within fifteen (15) days of the due date thereof (except for the payment due on the Maturity Date) to cover the extra expense involved in handling delinquent payments, provided that collection of said late charge shall not be deemed to excuse a late payment or be deemed a waiver by the Lender of any of its rights under this Note, including, without limitation, the right to declare the entire unpaid principal and interest immediately due and payable.

**Acceleration:**

Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Agreement, the principal of this Note or any unpaid part thereof and all accrued interest thereon shall, in the sole discretion of Lender, at once become due and payable and may be collected forthwith without notice to the undersigned, regardless of the stipulated date of maturity. After maturity or acceleration, the entire outstanding principal shall bear interest at the "default interest rate". However, Lender may, in the sole discretion of Lender, accept payments made by Maker after any default has occurred, without waiving any of Lender's rights herein.

**Costs:**

In the event that this Note is collected by law or through attorneys at law, or under advice therefrom (whether such attorneys are employees of the Lender or an affiliate of the Lender or are outside counsel), the Maker and any endorser, guarantor or other person primarily or secondarily liable for payment hereof hereby, severally and jointly agree to pay all costs of collection, including reasonable attorneys' fees (including charges for paralegals and others working under the direction or supervision of the Lender's attorneys) whether or not suit is

brought, and whether incurred in connection with collection, trial, appeal, bankruptcy or other creditors' proceedings or otherwise.

**Usury Savings Clause**:

Nothing herein contained, nor any transaction related thereto shall be construed or so operate as to require Maker or any person liable for the repayment of same, to pay interest in an amount or at a rate greater than the maximum allowed by applicable law. Should any interest or other charges paid by Maker, or any parties liable for the payment of the loan made pursuant to this Note, result in the computation or earning of interest in excess of the maximum legal rate of interest permitted under the law in effect while said interest is being earned, then any and all of that excess shall be and is waived by Lender, and that excess shall be automatically credited against and in reduction of the principal balance, and any portion of the excess that exceeds the principal balance shall be paid by Lender to Maker or any parties liable for the payment of the loan made pursuant to this Note so that under no circumstances shall the Maker, or any parties liable for the payment of the loan hereunder, be required to pay interest in excess of the maximum rate allowed by applicable law.

**Jurisdiction:**

In the event that legal action is instituted to collect any amounts due under, or to enforce any provision of, this Note, Maker and any endorser, guarantor or other person primarily or secondarily liable for payment hereof consent to, and by execution hereof submit themselves to, the jurisdiction of the courts of the State of Florida, and, notwithstanding the place of residence of any of them or the place of execution of this instrument, such litigation may be brought in or transferred to either a federal or state a court of competent jurisdiction in Tampa, Florida.

**Waivers and Agreements**:

Maker and any other person liable for the payment hereof respectively, hereby (a) expressly waive any valuation and appraisal, presentment, demand for payment, notice of dishonor, protest, notice of nonpayment or protest, all other forms of notice whatsoever, and diligence in collection; (b) consent that Lender may, from time to time and without notice to any of them or demand, (i) extend, renew or postpone any or all payments, (ii) release all or any part of the collateral for this Note, and/or (iii) release Maker or any other person liable for payment hereof, without in any way modifying, altering, releasing, affecting or limiting their respective liability or the lien of any security instrument; and (c) agree that Lender, in order to enforce payment of this Note against any of them, shall not be required first to institute any suit or to exhaust any of its remedies against Maker or against any other person liable for payment hereof or to attempt to realize on any collateral for this Note.

**Liens; Set-Off:**

The Maker hereby grants to the Lender a continuing lien to secure all indebtedness of the Maker to the Lender whether created hereunder, pursuant hereto, or otherwise upon any and all monies, securities and other property of the Maker and the proceeds thereof, now or hereafter held or received by or in transit to, the Lender from or for the Maker, and also upon any and all deposits (general or special) and credits of the Maker, if any, at the Lender, at any time existing. Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby

authorized at any time and from time to time, without notice to the Maker, to set off, appropriate, and apply any or all items hereinabove referred to against all indebtedness of the Maker owed to the Lender, whether under the Loan Documents or otherwise, whether now existing or hereafter arising. The Lender shall be deemed to have exercised such right of set-off and to have made a charge against such items immediately upon the occurrence and during the continuance of such Event of Default although made or entered on its books subsequent thereof.

**Swap Documents:**

Maker covenants and agrees that it will maintain in full force and effect any ISDA Master Agreement between Maker and Lender, or its affiliate, and all swap documents, and related agreements, together with any related schedules and confirmations entered into now or that may be entered into in the future (being collectively referred to as the "Swap Documents"), and promptly and perform all of its obligations under the Swap documents. The payment of this Note, and the payment and performance of Maker's obligations under the Swap Documents, are hereby secured by the pledge and other related security instruments, and all Swap Documents are hereby deemed to be part of the Loan Documents. A default under any of the Swap Documents shall be a default under this Note, the Loan Agreement, and all security instruments related thereto.

**Miscellaneous:**

A.     TIME BEING OF THE ESSENCE OF THIS NOTE.

B.     It is agreed that the granting to Maker of this Note or any other party of an extension or extensions of time for the payment of any sum or sums due hereunder or for the performance of any covenant or stipulation thereof or the taking of other or additional security shall not in any way release or affect the liability of the Maker of this Note.

C.     This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

D.     All parties to this Note, whether Maker, principal, surety, guarantor of endorser, hereby waive presentment for payment, demand, notice, protest, notice of protest and notice of dishonor.

E.     The Maker hereof acknowledges that the Lender shall have no obligation whatsoever to renew, modify or extend this Note or to refinance the indebtedness under this Note upon the maturity thereof, except as specifically provided herein.

F.     Lender shall have the right to accept and apply to the outstanding balance of this Note any and all payments or partial payments received from Maker after the due date therefor whether the Note has been accelerated or not without waiver of any and all of Lender's rights to continue to enforce the terms of the Note and to seek any and all remedies provided for herein or any instrument securing the same including, but not limited to, the right to foreclose on such security.

G. The term "Maker" as used herein, in every instance shall include the makers, heirs, executors, administrators, successors, legal representatives and assigns, and shall denote the singular and/or plural, the masculine and/or feminine, and natural and/or artificial persons whenever and wherever the context so requires or admits.

H. Maker, as used herein, shall refer individually and collectively to all signers of this Note, whether signed now or in the future and all persons executing this Note shall be jointly and severally liable for the payment of this Note.

I. Lender may proceed to exercise its rights against the collateral described in the Loan Documents in any order that Lender elects, including proceeding against all of the collateral at one time or proceeding against any part of the collateral and subsequently proceeding against other parts of the collateral or not proceeding against other parts of the collateral. Each portion of the collateral is security for the entire indebtedness evidenced by this Note and, accordingly Lender may proceed against any part, or all, of the collateral for the repayment of the entire indebtedness evidenced by this Note and the other obligations secured by the Loan Documents.

J. The obligations of Maker under this Note shall be joint and several.

K. Maker is responsible for payment of all documentary stamp taxes, intangibles taxes, or other taxes or fees associated with this Note.

**Waiver of Trial by Jury**:

MAKER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS *(*WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER AGREEING TO ACCEPT THIS NOTE.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, Maker has executed this Note to be effective as of the date first stated above.

"Maker":

CRS HOLDING OF AMERICA, LLC,
a Delaware limited liability company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer

CREATIVE RECYCLING SYSTEMS, LLC,
a Florida limited liability company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer

DYNAMIC LEASING LLC,
a Florida limited liability company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer

BARGAIN COMPUTER PRODUCTS OF YBOR
CITY, LLC, a Florida limited liability company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF NORTH
FLORIDA, LLC, a Florida limited liability
company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC, a Florida limited liability company


By:_____
        Robert Edward Swett, as its
        Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC, a Florida limited liability company


By:_____
        Robert Edward Swett, as its
        Restructuring Officer


CREATIVE RECYCLING SERVICES, LLC, a Florida limited liability company


By:_____
        Robert Edward Swett, as its
        Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC, a Florida limited liability company


By:_____
        Robert Edward Swett, as its
        Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC, a Florida limited liability company


By:_____
        Robert Edward Swett, as its
        Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF
TENNESSEE, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING TECHNOLOGIES,
LLC, a Florida limited liability company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING TECHNOLOGIES II,
LLC, a Florida limited liability company

By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF
PENNSYLVANIA, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF
LOUISIANA, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer

CREATIVE RECYCLING SOLUTIONS, LLC, a
Florida limited liability company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING TECHNOLOGIES III,
LLC, a Florida limited liability company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


ENVIRONMENTAL SERVICES SALES &
MARKETING, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF
ILLINOIS, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer


PLANET GADGET USA, LLC, a Florida limited
liability company


By:_____
    Robert Edward Swett, as its
    Restructuring Officer

GREENROCK RARE EARTH RECOVERY, LLC,
a Florida limited liability company

By: _____
    Robert Edward Swett, as its
    Restructuring Officer

#32331337_v4

# EXHIBIT B

---

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**By and Between**

**CRS HOLDING OF AMERICA, LLC; CREATIVE RECYCLING SYSTEMS, LLC; DYNAMIC LEASING, LLC; BARGAIN COMPUTER PRODUCTS OF YBOR CITY, LLC; CREATIVE RECYCLING SYSTEMS OF NORTH FLORIDA, LLC; CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC; CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC; CREATIVE RECYCLING SERVICES, LLC; CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC; CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC; CREATIVE RECYCLING SYSTEMS OF TENNESSEE, LLC; CREATIVE RECYCLING TECHNOLOGIES, LLC; CREATIVE RECYCLING TECHNOLOGIES II, LLC; CREATIVE RECYCLING SYSTEMS OF PENNSYLVANIA, LLC; CREATIVE RECYCLING SYSTEMS OF LOUISIANA, LLC; CREATIVE RECYCLING SOLUTIONS, LLC; CREATIVE RECYCLING TECHNOLOGIES III, LLC; ENVIRONMENTAL SERVICES SALES & MARKETING, LLC; CREATIVE RECYCLING SYSTEMS OF ILLINOIS, LLC; PLANET GADGET USA, LLC; GREENROCK RARE EARTH RECOVERY, LLC; CREATIVE RECYCLING SYSTEMS OF NEW ENGLAND, LLC**

**a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, <u>the Borrower</u>**

**And**

**REGIONS BANK, <u>the Lender</u>**

**Dated as of August \_\_\_, 2014**

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated and effective as of August ___, 2014 ("the Effective Date"), is made by and between CRS HOLDING OF AMERICA, LLC; CREATIVE RECYCLING SYSTEMS, LLC; DYNAMIC LEASING, LLC; BARGAIN COMPUTER PRODUCTS OF YBOR CITY, LLC; CREATIVE RECYCLING SYSTEMS OF NORTH FLORIDA, LLC; CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC; CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC; CREATIVE RECYCLING SERVICES, LLC; CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC; CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC; CREATIVE RECYCLING SYSTEMS OF TENNESSEE, LLC; CREATIVE RECYCLING TECHNOLOGIES, LLC; CREATIVE RECYCLING TECHNOLOGIES II, LLC; CREATIVE RECYCLING SYSTEMS OF PENNSYLVANIA, LLC; CREATIVE RECYCLING SYSTEMS OF LOUISIANA, LLC; CREATIVE RECYCLING SOLUTIONS, LLC; CREATIVE RECYCLING TECHNOLOGIES III, LLC; ENVIRONMENTAL SERVICES SALES & MARKETING, LLC; CREATIVE RECYCLING SYSTEMS OF ILLINOIS, LLC; PLANET GADGET USA, LLC; GREENROCK RARE EARTH RECOVERY, LLC; CREATIVE RECYCLING SYSTEMS OF NEW ENGLAND, LLC (collectively, the "Borrower"), as borrower, and REGIONS BANK, an Alabama banking corporation (together with its successors, assigns and transferees, the "Lender"), as lender.

INTRODUCTORY STATEMENT

1.      On August 29, 2014, the Borrower filed a Petition with the Bankruptcy Court initiating the Case and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      The Borrower has requested, and the Lender has agreed to provide the Borrower with, a debtor-in-possession credit facility (the "DIP Facility") of up to $1,000,000 (the "DIP Facility Commitment") as a nonrevolving line of credit to be used exclusively: (i) for operating the Borrower's businesses; and (ii) for the costs and expenses of administering the Case (the "DIP Loan").

3.      To provide security for the repayment of the DIP Loan, and the payment of the other obligations of the Borrower hereunder, the Borrower will provide to the Lender the following (each as more fully described herein):

        (a)      a joint and several allowed superpriority administrative expense claim in the Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code; and

        (b)      a perfected first priority Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon the Collateral, including without limitation all interests of the Borrower in all unencumbered property of the estate in the Case, including Avoidance Actions, subject only to the Carve-Out Expenses; and

        (c)      a perfected first priority Lien, pursuant to Section 364(d)(1) of the Bankruptcy Code, subject only to the Carve-Out Expenses.

5.      All of the claims and the Liens granted hereunder in the Case to the Lender shall be subject to the Carve-Out Expenses to the extent provided in Section 2.12(b).

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Borrower and the Lender covenant and agree as follows:

## SECTION 1   DEFINITIONS AND INTERPRETATIONS

SECTION 1.01   **Defined Terms and Interpretations.** "60-Day Termination Date" shall have the meaning set forth in Section 2.01(c)(i).

"90-Day Termination Date" shall have the meaning set forth in Section 2.01(c)(i).

"Advance" and "Advances" shall have the meanings set forth in Section 2.01(a).

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, a Person (a "Controlled Person") shall be deemed to be "controlled by" another Person (a "Controlling Person") if the Controlling Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of the Controlled Person whether by contract or otherwise.

"Agreement" shall mean this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Allowed Professional Fees" shall have the meaning set forth in Section 2.12(b)(iii).

"Appraisers" shall mean one or more appraisal firms that may be retained by the Lender from time to time.

"Avoidance Actions" shall mean the Borrower's claims and causes of action arising under Section 502(d), 544, 547, 548 or 550 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code.

"Bankruptcy Code" shall mean The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Middle District of Florida or any other court having jurisdiction over the Case from time to time.

"Borrower" shall have the meanings set forth in the first paragraph of this Agreement.

"Budget" shall have the meaning set forth in Section 2.03.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banks in the State of New York are required or permitted to close.

"Carve-Out Default Notice" shall have the meaning set forth in <u>Section 2.12(b)(iii)</u>.

"Carve-Out Expenses" shall have the meaning set forth in <u>Section 2.12(b)</u>.

"Case" shall mean the Borrower's Chapter 11 case.

"Change of Control" shall mean (i) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of shares representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of the Borrower; or (ii) the occupation of a majority of the seats (other than vacant seats) on the board of directors, managers or similar authoritative body of the Borrower by Persons who were neither (A) nominated by the board of directors, managers or similar authoritative body of the Borrower nor (B) appointed by directors so nominated.

"Charges" shall mean all federal, state, county, city, municipal, local, foreign or other governmental taxes, levies, customs or other duties, assessments, charges, liens, and all additional charges, interest, penalties, expenses, claims or encumbrances upon or relating to (i) any Collateral, (ii) any Obligations, (iii) any employees or any payroll, income or gross receipts of the Borrower, (iv) the ownership or use of any assets by the Borrower, or (v) any other aspect of the Borrower's business.

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent to the making of the Interim DIP Loan set forth in <u>Section 4.01</u> have been satisfied or waived which date shall occur promptly upon entry of the Interim Order.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall have the meaning set forth in <u>Section 2.12(a)</u>.

"Collateral Documents" shall mean, collectively, this Agreement, the Security and Pledge Agreement, if any, and other agreements, instruments or documents that create or purport to create a Lien in favor of the Lender.

"Consummation Date" shall mean the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Reorganization Plan for the Borrower that is confirmed pursuant to an order of the Bankruptcy Court.

"DIP Facility" shall have the meaning set forth in the second paragraph of the Introductory Statement of this Agreement.

"DIP Facility Commitment" shall have the meaning set forth in the second paragraph of the Introductory Statement of this Agreement.

"DIP Loan" shall have the meaning set forth in the second paragraph of the Introductory Statement of this Agreement.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Environmental Laws" means all federal, state or commonwealth and local laws, regulations, statutes, codes, rules, resolutions, directives, orders, executive orders, consent orders, written or published guidance from regulatory agencies, judicial decrees, standards, permits, licenses and ordinances, or any judicial or administrative interpretation of any of the foregoing, pertaining to the protection of land, water, air or the environment, whether now or in the future enacted, promulgated or issued.

"Environmental Liabilities" as used herein shall mean all liabilities, obligations, responsibilities, remedial actions, removal costs, losses, damages of whatever nature, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim, suit, action or demand of whatever nature by any Person and which relate to any health or safety condition regulated under any environmental law, environmental permits or in connection with any release, threatened release, or the presence of a hazardous material.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or a Subsidiary of the Borrower would be deemed to be a single employer within the meaning of Section 414(b), (c), (m), or (o) of the Code.

"ERISA Event" shall mean (i) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (ii) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (iii) the filing pursuant to Section 412(b) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (iv) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (v) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan; (vi) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to any withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (vii) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" shall have the meaning set forth in Section 7.

"Expenses" shall mean have the meaning set forth in Section 2.11.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Filing Date" shall mean August 29, 2014.

"Final DIP Loan Amount" shall mean the full monetary value of the DIP Facility Commitment.

"Final Order" shall mean a final order entered by the Bankruptcy Court, approving in full the DIP Facility.

"Financial Officer" shall mean the Chief Restructuring Officer, Chief Financial Officer, Treasurer or Vice President of the Borrower, or Chapter 11 Trustee.

"Financial Reporting Documents" shall have the meaning set forth in Section 5.01.

"GAAP" shall mean generally accepted accounting principles applied in accordance with Section 1.02.

"Governmental Authority" shall mean any Federal, state, municipal or other governmental department, commission, board, bureau, agency, administration or instrumentality or any court with jurisdiction over the Borrower, in each case whether of the United States or foreign.

"Gross-Up Payment" shall have the meaning set forth in Section 2.10(a).

"Indebtedness" shall mean the outstanding and unpaid amounts owed to the Lender under the DIP Facility.

"Indemnified Party" shall have the meaning set forth in Section 10.05.

"Interim DIP Loan" shall mean an interim loan amount in the aggregate amount of $750,000.

"Interim Order" shall mean the interim order entered by the Bankruptcy Court approving the Interim DIP Loan.

"Investments" shall have the meaning set forth in Section 6.09.

"Leases" shall mean all of those leasehold estates in real property now owned or hereafter acquired by the Borrower, as lessee.

"Lender" shall have the meaning given such term in the first paragraph of this Agreement.

"Lien" shall have the meaning set forth in Section 2.12(a).

"Loan Documents" shall mean this Agreement, the Note, the Collateral Documents, and any other instrument or agreement executed and delivered to the Lender in connection herewith, in each case, as the same may be amended, modified, supplemented, extended or restated from time to time.

"Maturity Date" shall have the meaning set forth in Section 2.01(c).

"Minimum Actionable Amount" shall have the meaning set forth in Section 3.13.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower, or a Subsidiary of the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"Net Proceeds" shall mean, (i) in respect of any sale of assets, the cash proceeds of such sale after the payment of or reservation for expenses, that are consented to by the Lender, which consent will not be unreasonably withheld, that are directly related to (or the need for which arises as a result of) the sale transaction, including, but not limited to, related costs, taxes (excluding income taxes) payable, brokerage commissions, professional expenses (other than fees of Professionals) and other similar costs that are directly related to the sale, (ii) in respect of any casualty insurance proceeds, all such insurance proceeds less only the portion thereof, the Lender allows to be used to pay the cost of repairs, and (iii) proceeds from any other capital-type transaction.

"Non-Default Rate" shall have the meaning set forth in Section 2.05.

"Note" shall have the meaning set forth in Section 2.04(d).

"Obligations" shall mean all loans, Advances, debts, liabilities and obligations for the performance of covenants or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by the Borrower or any other obligor under any of the Loan Documents to the Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the Loan Documents.

"Orders" shall mean the Interim Order and the Final Order of the Bankruptcy Court.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment

made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

"Payee" and "Payees" shall have the meanings set forth in Section 2.10(a).

"PBGC" shall mean the Pension Benefit Guaranty Corporation, or any successor agency or entity performing substantially the same functions.

"Permitted Liens" shall mean: liens imposed by law (other than environmental liens and any lien imposed under ERISA) for taxes, assessments or charges of any Governmental Authority for claims not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained in accordance with GAAP.

"Person" shall mean any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, company, estate, statutory trust, unincorporated organization or government or any agency or political subdivision thereof.

"Petition" shall mean the Borrower's voluntary petition for relief filed with the Bankruptcy Court.

"Plan" shall mean a Single Employer Plan or a Multiemployer Plan.

"Pre-Petition Payment" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables (including, without limitation, in respect of reclamation claims) or other pre-petition claims against the Borrower.

"Proceeds" shall have the meaning ascribed thereto in the Uniform Commercial Code as enacted in the State of Delaware.

"Professionals" shall have the meaning set forth in Section 2.12(b)(iii).

"Professional Fee Carve-Out" shall have the meaning set forth in Section 2.12(b)(iii).

"Regulated Substances" shall have the meaning set forth in Section 3.14.

"Reorganization Plan" shall mean a plan of reorganization for the Borrower in the Case.

"Request for Funding" shall have the meaning set forth in Section 2.02(a).

"Reporting Date" shall have the meaning set forth in Section 5.01.

"Section 363 Sale" shall mean a sale of all or substantially all of the Borrower's assets pursuant to Section 363 of the Bankruptcy Code.

"Security and Pledge Agreement" shall have the meaning set forth in <u>Section 5.12</u>.

"Single Employer Plan" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (i) is maintained for employees of the Borrower or an ERISA Affiliate or (ii) was so maintained and in respect of which the Borrower could reasonably be expected to have liability under Title IV of ERISA in the event such Plan has been or were to be terminated.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors is, at the time as of which any determination is being made, owned or controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Superpriority Claim" shall have the meaning set forth in <u>Section 2.12(a)</u>.

"Taxes" shall have the meaning set forth in Section 2.10(a).

"United States Trustee Fees" shall mean those statutory fees payable to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6).

SECTION 1.02    **Terms Generally.**

The definitions in <u>Section 1.01</u> shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u>, <u>however</u>, that for purposes of determining compliance with any covenant set forth in <u>Section 5</u>, such terms shall be construed in accordance with GAAP as in effect on the date of this Agreement applied on a basis consistent with the application used in the Borrower's unaudited financial statements referred to in <u>Sections 5.01 and 5.02</u>.

SECTION 2.    **AMOUNT AND TERMS OF CREDIT**

SECTION 2.01 **DIP Facility; Availability; Commitment Fee**


(a)    From time to time prior to the Maturity Date and subject to the provisions below, the Lender shall make advances (each an "Advance" and collectively, the "Advances") to the Borrower under the DIP Facility pursuant to the Budget which shall serve as a non-revolving line of credit, upon the satisfaction and acceptance by the Lender of the applicable conditions set

forth in <u>Section 2.02</u>, up to an aggregate outstanding principal amount not to exceed the amount of the Interim DIP Loan or DIP Facility Commitment, as appropriate, except as provided herein.

(b)     Once amounts are advanced to the Borrower as Advances under the DIP Facility, the DIP Facility Commitment shall be reduced by the amount so advanced and may not be re-borrowed.

(c)     The availability of the DIP Facility shall terminate upon the earliest of:

(i)  the date that is sixty (60) days from the Filing Date (the "<u>60-Day Termination Date</u>") (<u>provided</u>, <u>that</u> such date can be extended to ninety (90) days from the Filing Date (the "<u>90-Day Termination Date</u>") if the Borrower files with the Bankruptcy Court on or before the 60-Day Termination Date a Reorganization Plan in form and substance acceptable to the Lender, or Borrower files a Section 363 Sale Motion within fifteen days of the Filing Date with Lender's consent, and the Bankruptcy Court approves the sale within 60 days of the Filing Date, and closing is scheduled between 60 and 90 days of the Filing Date, or such later date to which the Lender may agree in writing,

(ii)  the effective date of a Reorganization Plan concerning the Borrower which the Lender has accepted,

(iii)  upon the closing of any Section 363 Sale or other sale of a material portion of the Borrower's assets approved by the Bankruptcy Court and consented to by the Lender, provided that such 363 sale shall be approved by order of the Bankruptcy Court on or before 60 days after the Effective date of this Agreement unless Lender in writing agrees to an extension of this period, or

(iv)  the date on which an Event of Default occurs (which earliest date is called the "<u>Maturity Date</u>").

All amounts outstanding and any other Obligations of the Borrower under the DIP Facility shall be due and payable in full in case on the Maturity Date and no further Advances may be drawn on or after the Maturity Date.  On the Maturity Date, either (i) all Obligations of the Borrower to Lender under the DIP Facility shall be paid in full in cash, or (ii) upon three (3) Business Days' notice to the Borrower if the Maturity Date occurs prior to the 60-Day Termination Date (or if applicable, the 60-Day Termination Date), and immediately on and after the 60-Day Termination Date (or if applicable, the 90-Day Termination Date), Lender shall be entitled to exercise all rights and remedies with respect to the DIP Facility and the Collateral pursuant to relief from the automatic stay to be granted in the Interim Order and, if applicable, the Final Order.

(d)     The Borrower agrees to pay to the Lender a one-time commitment fee equal to $20,000, plus all documentary stamp, intangibles, or other taxes associated with the Note and this DIP Facility.  Such amount is payable on the date of the first Advance under the DIP Facility.

SECTION 2.02     **Conditions to Making each Advance**.  The funding of each Advance prior to the Maturity Date shall be conditioned upon the fulfillment of conditions and

requirements acceptable to the Lender in its reasonable discretion (unless otherwise noted), including, without limitation:

(a)    The Lender shall receive from the Borrower a request for funding ("Request for Funding") in form and substance reasonably satisfactory to the Lender, specifying, among other items, the date and the Advance requested amount, which must comply with the terms and limitations of Section 2.03.  Each Request for Funding and all required documentation for an Advance shall be submitted to the Lender at least two (2) Business Days prior to the proposed funding date and such Advance amount shall be in accordance with the Budget and shall be disbursed on the proposed funding date set forth in the Request for Funding; provided that if a Request for Funding is withdrawn by the Borrower prior to funding, the Borrower will pay to the Lender a penalty in the amount of the actual costs and expenses incurred by the Lender due to such withdrawal;

(b)    The Borrower must have delivered the Financial Reporting Documents on the appropriate Reporting Date;

(c)    The Borrower's representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the date on which such Advance is made as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement;

(d)    The Advance requested would not cause the aggregate outstanding amount of the Advances to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be;

(e)    Deadlines for the filing of a Reorganization Plan and accompanying disclosure statement or a Section 363 Sale and related sale procedures, each in form and content acceptable to the Lender in its sole discretion, for Bankruptcy Court approval have been met as applicable at the time of such Advance;

(f)    There is not pending in the Case a motion to sell all or a material portion of the Borrower's assets pursuant to a Section 363 Sale or other transaction that is not acceptable to the Lender in its sole and absolute discretion, or a Reorganization Plan that is not acceptable to Lender in its sole and absolute discretion; provided, however, that the Lender may waive such restriction in writing, in its sole and absolute discretion, with respect to any Request for Funding delivered to Lender if either of the aforementioned situations is pending before the Bankruptcy Court;

(g)    The Bankruptcy Court shall have approved Robert Swett to be either the Chief Restructuring Officer or the Chapter 11 Trustee for the Borrower.

(h)    The Advance requested is reasonably necessary to meet the Borrower's obligations for such week or month, as the case may be, in accordance with the Budget taking into account the Borrower's cash on hand at the time the Request for Funding delivered to the Lender; and

(i)     There exists no Event of Default.

SECTION 2.03   **Use of Proceeds**.     Funds advanced under the DIP Facility Commitment will be used for working capital, in accordance with a detailed, line item, 13 week budget (the "Budget") attached hereto as Schedule 2.03, as such Budget may be extended or modified with the Lender's prior written approval in its sole discretion, for the post-petition operating expenses and other costs and expenses of administration of the Borrower's Cases, which shall be commenced in the Bankruptcy Court.   Any Budget extension or modification request shall be provided to the Lender at least five (5) Business Days prior to the expiration of the existing Budget.   The Borrower shall present to Lender at the end of each week a revised Budget for Lender's review and written approval in its sole discretion.   The Lender will permit up to **10% excess on each line** item with no more than **an aggregate 5% excess** a week under the Budget (provided that in no event shall the DIP Facility Commitment exceed $1,000,000, but line item budgeted expenses not paid in any given week may be rolled over into the next succeeding week and thereafter.   No DIP Loan proceeds may be used to commence or prosecute any action or contested matter to assert any claim or cause of action against the Lender or its Affiliates.   The DIP Loan proceeds shall not be used in any manner, or transferred to any person or entity, except as permitted by the Lender in its sole discretion or as set forth in the Budget.

SECTION 2.04      **Repayment of DIP Loan; Evidence of Debt**.

(a)     The Borrower hereby unconditionally promises to pay to the Lender, on the Maturity Date, the then unpaid principal amount of each Advance made by the Lender and accrued interest thereon and all other unpaid Obligations under the DIP Loan.

(b)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the Lender resulting from each Advance made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(c)     The entries made in the accounts maintained pursuant to paragraph (b) of this Section 2.04 shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of any Borrower to repay the outstanding balance of, and accrued interest on, the DIP Loan in accordance with the terms of this Agreement.

(d)     All Advances made hereunder by the Lender shall be evidenced by a promissory note payable to the order of the Lender in form and substance satisfactory to the Lender (the "Note").

(e)     Borrower shall pay all documentary stamp, intangibles, or other taxes associated with the Note.

SECTION 2.05   **Interest on Loans**.   Each Advance under the DIP Facility will bear cash interest at a variable rate of interest equal to the prime rate plus five percent (prime + 5%) per annum (the "Non-Default Rate"), computed on the basis of a three hundred and sixty (360) day year and assessed for the actual number of days elapsed on the amount of Advances

outstanding, payable at the Maturity Date; provided however that in no event shall such interest rate exceed the maximum lawful interest rate.

SECTION 2.06    **Default Interest**.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, each Advance under the DIP Facility will bear cash interest at a rate equal to the Non-Default Rate plus four percent (4%) per annum.

SECTION 2.07    **Mandatory Prepayments; Commitment Termination; Collateral**If at any time the aggregate principal amount of the outstanding Advances under the DIP Facility exceeds the DIP Facility Commitment, the Borrower will, no later than the next Business Day, prepay an amount necessary to cause the aggregate principal amount of the outstanding Advances under the DIP Facility to be less than the DIP Facility Commitment.

(b)    Net Proceeds from the sale of, recovery of casualty proceeds or any other capital event relating to any Collateral (other than the sales of finished goods to customers in the ordinary course of the Borrower's business) shall be applied, at the sole discretion of the Lender and at the time of closing on such sale, first to reduce any amount outstanding under the DIP Facility owed to the Lender, with the balance, if any, to be held by the Borrower pending further order of the Bankruptcy Court.  Net Proceeds that are applied to reduce the DIP Facility shall not be available for re-borrowing.

(c)    Upon the Maturity Date, the DIP Facility Commitment shall be terminated in full and the Borrower shall pay all amounts outstanding under the DIP Facility in full (plus any accrued but unpaid interest thereon, unpaid fees and all other Obligations hereunder).

SECTION 2.08    **Optional Prepayment of Loans**  The Borrower shall have the right at any time and from time to time to prepay any Advances, in whole or in part.

SECTION 2.09    **Pro-rata Treatment; Payments, etc**.  All payments by the Borrower hereunder or under any Note shall be (i) net of any Taxes applicable to the Borrower and (ii) made in Dollars in immediately available funds at the office of the Lender by 12:00 noon, New York City time, on the date on which such payment shall be due.  Interest in respect of any Advance hereunder shall accrue from and including the date of such Advance to but excluding the date on which such Advance is paid in full.  Other than Net Proceeds relating to any Collateral as set forth in Section 2.07(b), all payments of principal or interest of any Advance shall be applied in such order as the Lender determines in its sole discretion.

SECTION 2.10    **Gross-Up for Taxes**All payments by the Borrower of principal of and interest on the Advances and of all fees and other amounts payable under this Agreement shall be made free and clear of, and without withholding or deduction by reason of, any present or future taxes, levies, duties, imposts, assessments or other charges levied or imposed by any Governmental Authority (other than franchise taxes and taxes on or measured by the overall net income of the Lender) (collectively, "Taxes").  If the Borrower shall be required by law to withhold or deduct any Taxes from or in respect of any sum payable under this Agreement to the Lender or assignee of the Lender (each, individually, a "Payee" and collectively, the "Payees"), (i) the sum payable to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all required withholding or deductions, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "Gross-Up Payment"), (ii) the Borrower shall make such withholding or deductions and (iii) the Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other Governmental Authority in accordance with applicable law. The Borrower shall promptly furnish to the Lender upon request of the Lender or any such Payee, official receipts evidencing such withholding, deduction or payment.

(a)    The Borrower will indemnify each Payee (without duplication) against, and reimburse each Payee for, all present and future Taxes (including, without limitation, interest and penalties) levied or collected (whether or not legally or correctly imposed, assessed, levied or collected) on or with respect to this Agreement or any Loan Document or the Obligations or any portion thereof.  Each such indemnification shall be on an after-tax basis, taking into account any such Taxes imposed on the amounts paid as indemnity.

(b)    Without prejudice to the survival of any other term or provision of this Agreement, the obligations of Borrower under this Section 2.10 shall survive the payment of the DIP Loan and other Obligations and the termination of the DIP Facility Commitment.

SECTION 2.11    **Certain Expenses**.  The Borrower shall pay, as obligations under the DIP Facility, all reasonable out of pocket costs and expenses of the Lender and its members (including all reasonable fees, expenses and disbursements of outside counsel and consultants) (collectively, the "Expenses"), incurred after the commencement of the Case, in connection with the: (i) negotiation, preparation, execution and delivery of the documentation of the DIP Facility; (ii) enforcement or protection of the Lender's claims, rights and remedies under the DIP Facility; (iii) administration of the DIP Facility and any amendment or waiver of any provision of the DIP Facility documentation; and (iv) the Case or any proceedings commented therein.

SECTION 2.12    **Priority and Liens**The priority of Lender's Liens on the Collateral owned by Borrower shall be set forth in the Interim Order and the Final Order:  The Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order (i) all amounts owing to the Lender under the DIP Facility at all times will constitute allowed super-priority administrative expense claims, pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code, subject only to the Carve-Out Expenses (collectively, the "Superpriority Claim");  and (ii) all Obligations owing to the Lender under the DIP Facility will be secured pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code by a first priority perfected security interest in and lien upon all assets

(whether tangible, intangible, real, personal or mixed) of the Borrower, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, cash, cash collateral, equipment, capital stock in subsidiaries, membership interests in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, copyrights, trademarks, causes of action, including the Avoidance Actions and proceeds of avoidance actions, and other general intangibles, and all products, additions, accessions and proceeds thereof (the "Collateral"), all subject only to the Carve-Out Expenses (collectively, the "Liens"), senior to all liens and encumbrances except the Carve-Out Expenses.

(b)     The Liens and Superiority Claims shall be subject only to the right of payment of the following expenses (the "Carve-Out Expenses"):

(i)     the U.S. Trustee Fees;

(ii)     fees payable to the Clerk of the Bankruptcy Court;

(iii)     upon the declaration by the Lender of the occurrence of an Event of Default and demand for the immediate repayment in full of all Obligations (a "Carve-Out Default Notice"), the unpaid and outstanding fees and expenses actually incurred on or after the Filing Date, and approved by order of the Bankruptcy Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees") by attorneys, accountants and other professionals retained by the Borrower or any official committee of unsecured creditors, Robert Swett, appointed by the United States Trustee in the Case (collectively, the "Professionals"), or (A) the aggregate amount allocated in the Budget for such Professionals from the Filing Date to the date of the Event of Default, minus (B) payments made by the Borrower on account of the fees and expenses of such Professionals, and minus (C) the amount of any retainer held by or for such Professionals on the Filing Date (the "Professional Fee Carve-Out") whichever is less; and

(iv)     Unpaid ordinary course of business payroll expenses as set forth in the Budget accrued through the date of a Carve-Out Default Notice.

(c)     None of (i) the Professional Fee Carve-Out, (ii) any proceeds of the DIP Facility, or (iii) the Collateral, may be used to pay any Allowed Professional Fees or any other fees and/or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (i) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or the Lender's pre-petition liens on and security interests in any collateral serving any prepetition claim of Lender, (ii) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Lender's post-petition liens on and security interests in any Collateral, (iii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or the Lender's post-petition liens on and security interests in any Collateral, or (iv) preventing the Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral, (b) a request to use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Lender, (c) a request for authorization to obtain debtor-in-possession

financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than from the Lender without the prior written consent of the Lender, unless the amount of such financing is sufficient to pay in full the outstanding Obligations under this Agreement (d) the commencement or prosecution of any action or proceeding on any claims, causes of action, or defenses against the Lender or any of its members, officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, or (e) any act which has or could reasonably have the effect of resulting in the occurrence of an Event of Default under this Agreement and/or the Interim or Final Order.

**SECTION** 2.13 **Right of Set-Off**

. Subject to the provisions of <u>Section 7.01</u>, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender against any and all of the obligations of the Borrower now or hereafter existing under the Loan Documents, irrespective of whether or not the Lender shall have made any demand under any Loan Document and although such obligations may not have been accelerated. The Lender agrees to promptly notify the Borrower after any such set-off and application made by the Lender, <u>provided</u>, that the failure to give such notice shall not affect the validity of such set-off and application and shall not result in any liability to the Lender. The rights of the Lender under this Section 2.13 are in addition to other rights and remedies which the Lender may have upon the occurrence and during the continuance of any Event of Default.

SECTION 2.13 **Payment of Obligations**. Upon the Maturity Date, the Lender shall be entitled to immediate payment, in cash and immediately available funds, of all Obligations without further application to or order of the Bankruptcy Court.

SECTION 3. **REPRESENTATIONS AND WARRANTIES** In order to induce the Lender to make available the DIP Loan hereunder, the Borrower represents and warrants as follows:

SECTION 3.01 **Organization and Authority**. The Borrower (i) is validly existing under the laws of the State of Delaware, and is duly organized and is duly qualified as a foreign organization and is in good standing in each jurisdiction in which the failure to be so organized or so qualified would have a material adverse effect on the financial condition, operations, business, properties, assets or prospects of the Borrower; (ii) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) has the requisite company power and authority to effect the transactions contemplated hereby, and by the other Loan Documents to which it is a party, and (iii) subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) has all requisite company power and authority and, upon the entry of the Interim Order (or the Final Order, when applicable) the legal right to own, grant Liens on and operate its properties, and to conduct its business as now or currently proposed to be conducted.

SECTION 3.02 **Due Execution; No Consents**. Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the execution, delivery and

performance by the Borrower of each of the Loan Documents to which it is a party (i) are within the company power of the Borrower, have been duly authorized by all necessary company action including the consent of equity holders if required, and do not (A) contravene the certificate of formation operating agreements or other constituent documents of the Borrower, (B) violate any law (including, without limitation, the Securities Exchange Act of 1934, as amended) or regulation (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System), or any order or decree of any court or Governmental Authority, (C) conflict with or result in a breach of, or constitute a default under, any material indenture, mortgage or deed of trust entered into after the Filing Date or any material lease, agreement or other instrument entered into after the Filing Date and binding on the Borrower or any of its properties, or (D) result in or require the creation or imposition of any lien upon any of the property of the Borrower other than the Liens granted pursuant to this Agreement, the other Loan Documents or the Orders; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Authority other than the entry of the Orders, the filing of financing statements, at the option of the Lender, under the Delaware Uniform Commercial Code and the filings contemplated by the Collateral Documents. This Agreement has been duly executed and delivered by the Borrower. This Agreement is, and each of the other Loan Documents to which the Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms and the Orders.

SECTION 3.03    **Statements Made**. The information that has been delivered in writing by the Borrower to the Lender or to the Bankruptcy Court in connection with any Loan Document, and any financial statement delivered pursuant hereto or thereto (other than to the extent that any such statements constitute projections), taken as a whole and in light of the circumstances in which made, contains no untrue statement of a material fact and does not omit to state a material fact necessary to make such statements not misleading; and, to the extent that any such information constitutes projections, such projections were prepared in good faith on the basis of assumptions, methods, data, tests and information believed by the Borrower to be reasonable at the time such projections were furnished (it being understood that projections by their nature are inherently uncertain, that no assurances can be given that projections will be realized and that actual results may in fact differ materially from any projections provided to the Lender).

SECTION 3.04    **Ownership; Location**. **[RESERVED]**

SECTION 3.05    **Liens**. Except for the liens existing on the Filing Date as reflected on Schedule 3.05, there are no liens of any nature whatsoever on any assets of the Borrower other than: (i) Permitted Liens; (ii) other liens permitted pursuant to <u>Section 6.01</u>; and (iii) liens in favor of the Lender. The Borrower is not a party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a lien on any assets of the Borrower or otherwise result in a violation of this Agreement other than Permitted Liens and the Liens granted to the Lender as provided for in this Agreement.

SECTION 3.06    **Compliance                                    with                                    Laws**

(a)     Except for matters which would not reasonably be expected to have a material adverse effect on the financial condition, operations, business, properties, assets or prospects of the Borrower, the operations of the Borrower comply in all material respects with all applicable laws.

(b)     The Borrower is not, to the best of each of its knowledge, in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Authority the violation of which, or a default with respect to which, would have a material adverse effect on the financial condition, operations, business, properties, assets or prospects of the Borrower.

SECTION 3.07    **Insurance**.  All policies of insurance of any kind or nature owned by or issued to the Borrower, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect.

SECTION 3.08    **Use of Proceeds**.  The proceeds of the Advances shall be used in accordance with Section 2.03 (including for the payment of fees and transaction costs as contemplated hereby and as referred to in Section 2.11).  Such proceeds may not be used in connection with the formal discovery proceedings, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lender.

SECTION 3.09    **Litigation; Labor Matters**Other than as set forth on Schedule 3.09(a), there are no unstayed actions, suits, proceedings or investigations pending or, to the knowledge of the Borrower, threatened against or affecting any Borrower or any of its properties, before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which is reasonably likely to be determined adversely to the Borrower and, if so determined adversely to the Borrower, would reasonably be expected to have a material adverse effect on the financial condition, business, properties, prospects, operations or assets of the Borrower.

(a)     There are no strikes or other material labor disputes against Borrower that are pending or, to the knowledge of Borrower, threatened.  Hours worked by and payment made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other applicable laws dealing with such matters.  All material payments due from Borrower on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrower.  Except as set forth in Schedule 3.09(b), Borrower has no obligation under any collective bargaining agreement, management agreement, or any employment agreement, and a correct and complete copy of each agreement listed in Schedule 3.09(b) has been provided to Lender.  Except as set forth in Schedule 3.09(a), there are no representation proceedings pending or, to the knowledge of Borrower, threatened with the National Labor Relations Board, and no labor organization or group of employees of Borrower has made a pending demand for recognition, and, there are no complaints or charges against Borrower pending or, to the knowledge of Borrower, threatened to be filed with any federal, state, local or foreign court, governmental agency or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by Borrower of any individual.

SECTION 3.10 **Margin Regulations; Investment Company Act; Brokers**.The Borrower is not engaged and will not engage, principally or as one of their important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(a)     Borrower is not (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act or any other federal or state statute that restricts or limits Borrower's ability to incur Indebtedness, pledge its assets, or to perform its obligations hereunder, or under any other Loan Document; and the making of the Advances by the Lender, the application of the proceeds and repayment thereof by Borrower, and the consummation of the transactions contemplated by this Agreement and the other Loan Documents, will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.  The Borrower is not required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

(b)     No broker or finder, investment banker or other intermediary of any kind acting on behalf of Borrower brought about the obtaining, making or closing of the credit extended pursuant to this Agreement or the transactions contemplated by the Loan Documents, and Borrower has no obligation to any Person in respect of any finder's, brokerage investment banking, placement or other fees or amounts (including expenses) due in connection therewith.

SECTION 3.11 **Ownership of Property; Liens**.  **[RESERVED]**

SECTION 3.12 **Taxes**.  All tax returns, reports and statements required by any Governmental Authority to be filed by the Borrower have, as of the date hereof, been filed and will, until the Maturity Date, be filed with the appropriate Governmental Authority, and no tax lien will be filed against any of the Borrower's property.  Borrower shall schedule indebtedness to any taxing authority as required by the applicable bankruptcy rules.  Proper and accurate amounts have been and will be withheld by the Borrower from its employees for all periods in complete compliance with all requirements of law and all withholdings have and will be timely paid to the appropriate Governmental Authorities, in each case, except to the extent that failure to so withhold or pay such amount would not reasonably be expected to have a material adverse effect on the Borrower's business.  The Borrower (including any of its predecessors) is not liable for any Charges: (i) under any agreement (including any tax sharing agreements or agreement extending the period of assessment of any Charges) or (ii) to Borrower's knowledge, as a transferee.  As of the date hereof, the Borrower has not agreed or been requested to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which would reasonably be expected to have a material adverse effect on the Borrower's business.

SECTION 3.13 **ERISA**.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other existing ERISA Events, would reasonably be expected to result in a liability of the Borrower of more than the $50,000.00 (the "Minimum

Actionable Amount"). The present value of all accumulated benefit obligations of Borrower under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not exceed the fair market value of the assets of such Plan by more than the Minimum Actionable Amount, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Account Standards No. 87) did not exceed the fair market value of the assets of such underfunded Plans by more than the Minimum Actionable Amount. Neither the Borrower nor any ERISA Affiliate has incurred or reasonably expects to incur any withdrawal liability in excess of the Minimum Actionable Amount.

SECTION 3.14  **Hazardous Materials**. **[RESERVED]**

SECTION 3.15  **[RESERVED]**

SECTION 3.16  **Deposit and Disbursement Accounts**. Schedule 3.16 lists all banks and other financial institutions at which Borrower maintains deposits or other accounts or post office lock boxes and such Schedule 3.16 correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower has delivered to Lender true, correct and complete copies of all agreements, instruments and other documents relating to any credit card programs, arrangements or agreements to which it is a party.

SECTION 3.17  **[RESERVED]**

SECTION 3.18  **Customer and Trade Relations**. As of the Closing Date, except as set forth on Schedule 3.18, there exists no actual or threatened termination or cancellation of, or any material adverse modification or change in: (a) the business relationship of Borrower with any customer or group of customers whose purchases during the preceding twelve (12) months caused them to be ranked among the ten (10) largest customers of Borrower; or (b) the business relationship of Borrower with any supplier material to its operations.

SECTION 3.19  **Agreements and Other Documents**. As of the Final Order, Borrower shall provide the Lender and its counsel, accurate and complete copies (or summaries) of all of the following agreements or documents to which Borrower is subject: (a) supply agreements and purchase agreements not terminable by Borrower within sixty (60) days following written notice issued by Borrower and involving transactions in excess of $100,000 per annum; (b) any lease of equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $50,000 per annum; (c) licenses and permits held by Borrower, the absence of which could be reasonably likely to have a material adverse effect on the financial condition, operations, business, properties, assets or prospects of the Borrower; (d) instruments or documents evidencing indebtedness of Borrower and any security interest granted by Borrower with respect thereto; and (e) instruments and agreements evidencing the issuance of any membership interests, warrants, rights or options to purchase membership interests of Borrower.

SECTION 3.20  **Bankruptcy Matters**.

(a)     The Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and proper notice of the hearing for the approval of the Interim Order has been given and proper notice of the hearing for the approval of the Final Order will be given.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out Expenses.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien in and against all of the Collateral.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended (except as may be modified or amended with Lender's express written consent).

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

SECTION 3.21   **Survival of Representations and Warranties, Etc.**   All representations and warranties set forth in this Section 3 and all representations and warranties contained in any certificate delivered pursuant to this Agreement or in any of the other Loan Documents (including any such representation or warranty made in or in connection with any amendment thereto) shall constitute representations and warranties made under this Agreement. All representations and warranties made under this Agreement:  (i) shall be made or deemed to be made at and as of the date hereof, (ii) shall survive the date hereof and shall not be waived by the execution and delivery of this Agreement, any investigation made by or on behalf of the Lender and shall terminate one (1) year after all of the Obligations are satisfied in full and (iii) be deemed made on the date of each Advance hereunder (except those representations and warranties which are made only as of a date certain, which shall remain true and correct as of such date).

SECTION 4.   **CONDITIONS OF LENDING**

SECTION 4.01   **Conditions Precedent to Funding the Interim DIP Loan**.   The obligation of the Lender to make the Initial DIP Loan and Advances thereunder is subject to the satisfaction (or waiver by the Lender) of the following conditions precedent:

(a)     Supporting Documents.  The Lender shall have received for the Borrower a certificate of the Secretary of State of the State of Delaware, dated as of a recent date, as to the good standing of and/or payment of taxes by the Borrower.

(b)     Interim Order.  The order of the Bankruptcy Court in the form attached hereto as Exhibit A-1 (the "Interim Order"), or in such other form as the Lender and its counsel in their sole and absolute discretion may agree, approving the Loan Documents and granting the Superpriority Claim status and senior Liens described in Section 2.12 shall have been entered no later than seven (7) Business Days following the Filing Date and shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect that the Lender determines to be adverse to its interests; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Advances nor the performance by the Borrower of any of its respective obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)     The Borrower shall duly execute and deliver to the Lender a Note evidencing any Advances made by the Lender.

(d)     The Lender shall have received such other information (financial or otherwise) as may be reasonably requested by the Lender.

(e)     The Lender shall have received Uniform Commercial Code searches (including tax liens and judgment liens) conducted in such jurisdictions in which the Borrower conducts business and lien searches as may be reasonably satisfactory to the Lender (dated as of a date reasonably satisfactory to them), reflecting the absence of liens and encumbrances on the assets of the Borrower other than such liens permitted hereunder and as may be reasonably satisfactory to the Lender.

(f)     The Lender shall have been named as loss payee with respect to its Collateral, and additional insured (as its interests may appear), on such policies of insurance of the Borrower as the Lender may have reasonably requested.

(g)     The Lender shall have received all documents required by this Section 4.01 reasonably satisfactory in form and substance to the Lender.

(h)     The Borrower's representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the date on which such Advance is made as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement.

(i)     No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

(j)     The Court has approved Robert Swett as Chapter 11 Trustee or Chief Restructuring Officer.

SECTION 4.02    **Conditions Precedent to Funding the Final DIP Loan**.    The obligation of the Lender to make the Final DIP Loan and Advances thereunder is subject to the DIP Facility documentation, the Budget, the Final Order and the following conditions precedent:

(a)    The Lender shall have received a notice with respect to such borrowing or issuance, as the case may be, as required by Section 2.02.

(b)    All representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of each Advance with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date.

(c)    The Interim Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect that the Lender determine to be adverse to its interests without the prior written consent of the Lender.  The Lender shall have received a certified copy of the Final Order, in the form attached hereto as Exhibit A-2, with only such modifications as are satisfactory in form and substance to the Lender and its counsel in their sole and absolute discretion, which, in any event, shall have been entered by the Bankruptcy Court no later than the twenty-eight (28) days after the Filing Date, approving in full the DIP Facility in the aggregate amount, including all Advances under the Interim DIP Loan, of up to the DIP Facility Commitment of $1 million and the Final Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect that the Lender reasonably determine to be adverse to their interests and if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(d)    All Advances under the Interim Order shall have been borrowed and used in accordance with the Budget and any variations to which the Borrower and the Lender agree in writing.

(e)    No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

The request by the Borrower for, and the acceptance by the Borrower of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Borrower that the conditions specified in this Section 4.02 have been satisfied or waived at that time.

SECTION 5.    **AFFIRMATIVE COVENANTS**

From the date hereof and for so long as the DIP Facility Commitment shall be in effect, shall remain outstanding or any amount shall remain outstanding or unpaid under this Agreement (other than contingent indemnification obligations in respect of which no claims giving rise thereto have been asserted), the Borrower agrees that, unless the Lender shall otherwise consent in writing, the Borrower will:

SECTION 5.01   **Financial Statements, Reports, etc**.  Provide to the Lender no later than 3:00 p.m. on Tuesday of every week (each, a "Reporting Date") a weekly updated rolling 13-week cash flow forecast, plus the following: (i) a list of planned disbursements for the next succeeding week; and (ii) (a) a full accounting of all cash receipts and expenditures incurred for the past week commencing the opening of business on the Monday of such past week up through the close of business on such past week, (b) an update on the status of the steps taken with respect to the sale process and/or a reorganization plan, (c) an estimate of the funding required for the succeeding week to the extent it deviates from the amount set forth in the Budget, (d) any additional information reasonably required by the Lender (collectively, (i) and (ii)(a)-(d) are referred to as the "Financial Reporting Documents") and (e) a representation and warranty relating that all representations and warranties set forth herein remain true and correct in all material respects.

SECTION 5.02   **Financial Statements**.  **[RESERVED]**

SECTION 5.03   **Corporate Existence**.  Preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary or desirable in the normal conduct of its business except if such failure to preserve the same could not, in the aggregate, reasonably be expected to have a material adverse effect on the operations, business, properties, assets, prospects or condition (financial or otherwise) of the Borrower.

SECTION 5.04   **Insurance**.  Keep its insurable properties insured at all times against such risks, including fire and other risks insured against by extended coverage, as is customary with companies of the same or similar size in the same or similar businesses (including, without limitation, casualty insurance) and which is reasonably satisfactory to the Lender; and maintain in full force and effect public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by the Borrower, as the case may be, in such amounts (giving effect to self-insurance) and with such deductibles as are customary with companies of the same or similar size in the same or similar businesses and in the same geographic area; and  maintain such other insurance or self insurance as may be required by law.

SECTION 5.05   **Obligations and Taxes**.  With respect to the Borrower, pay all its material obligations arising after the Filing Date promptly and in accordance with their terms and pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property arising after the Filing Date, before the same shall become in default, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Filing Date which, if unpaid, would become a lien or charge upon such properties or any part thereof; provided, however, that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower shall have set aside on its books adequate reserves therefor.

SECTION 5.06   **Notice of Event of Default, etc**.  Promptly give to the Lender notice in writing of any Event of Default or the occurrence of any event or circumstance which with the passage of time or giving of notice or both would constitute an Event of Default.

SECTION 5.07    **Access to Books and Records**.  Maintain or cause to be maintained at all times true and complete books and records in accordance with GAAP of the financial operations of the Borrower and any Subsidiaries; and provide the Lender and their respective representatives and advisors access to all such books and records, as well as any appraisals of the Collateral, during regular business hours, in order that the Lender may upon reasonable prior notice examine and make abstracts from such books, accounts, records, appraisals and other papers for the purpose of verifying the accuracy of the various reports delivered by the Borrower and any Subsidiaries to the Lender pursuant to this Agreement or for otherwise ascertaining compliance with this Agreement; and at any reasonable time and from time to time during regular business hours, upon reasonable notice and with reasonable frequency, permit the Lender and any agents or representatives (including, without limitation, appraisers) thereof to visit the properties of the Borrower and any Subsidiaries and to conduct examinations of and to monitor the Collateral, not more than once every month at the expense of the Borrower.

SECTION 5.08    **Appraisals**.  **[RESERVED]**

SECTION 5.09    **Compliance With Terms of Leaseholds.**  Make all post-petition payments and otherwise perform all obligations in respect of all Leases of real property to the extent necessary to keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, notify the Lender of any default by any party with respect to such Leases and cooperate with the Lender in all respects to cure any such default, except, in any case, where the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a material adverse effect on the operations, business, properties, assets, prospects or condition (financial or otherwise) of the Borrower.

SECTION 5.10    **Business Plan**.  Make Robert Swett and Borrowers senior officers available to discuss the Borrower's business plan and the status and results of the Borrower's efforts with respect to the sale process and/or a reorganization plan .

SECTION 5.11    **Chief Restructuring Officer**.  On or before the Filing Date, the Borrower shall hire Robert Swett as chief restructuring officer or the Borrower shall obtain Bankruptcy Court approval for Robert Swett to be appointed either as Chapter 11 Trustee or chief restructuring officer for the Borrower, and Robert Swett shall remain employed in such capacity during the Case.

SECTION 5.12    **Security and Pledge Agreement; Mortgage**.  Upon the request of the Lender, the Borrower shall duly execute and deliver to such Lender a security and pledge agreement (the "Security and Pledge Agreement") in form and substance acceptable to the Lender and execute and permit the Lender to file a financing statement, in form and substance acceptable to the Lender, in the required jurisdiction.  The Orders shall provide, however, that the Liens granted to Lender are automatically granted and perfected by the Orders.

SECTION 5.13    **Reorganization Plan; Section 363 Sale**.  On or before fifteen (15) days after the Filing Date, the Borrower shall file a motion seeking approval by the Bankruptcy Court of a Section 363 Sale and the related sale procedures in a form and substance acceptable to

the Lender, with such sale to be scheduled within 60 days after the Filing Date, unless Lender in writing consents to other deadlines or approves Borrower not proceeding to such sale.

SECTION 6.     **NEGATIVE COVENANTS**

From the date hereof and for so long as the DIP Facility Commitment shall be in effect, shall remain outstanding or any amount shall remain outstanding or unpaid under this Agreement (other than contingent indemnification obligations in respect of which no claims giving rise thereto have been asserted), the Borrower will not (and will not apply to the Bankruptcy Court for authority to):

SECTION 6.01     **Liens**.  Incur, create, assume or suffer to exist any lien on any asset of the Borrower, now owned or hereafter acquired by the Borrower other than (i) liens which were existing on the Filing Date as reflected on Schedule 3.05; (ii) Permitted Liens; (iii) Liens in favor of the Lender securing the Obligations;

SECTION 6.02     **Merger, etc**.  Consolidate or merge with or into another Person.

SECTION 6.03     **Indebtedness**.  Contract, create, incur, assume or suffer to exist any indebtedness, except for (i) Indebtedness under the Loan Documents, (ii) indebtedness incurred prior to the Filing Date and (iii) indebtedness incurred in the ordinary course of the Borrower's business.

SECTION 6.04     **Capital Expenditures**.  Make any capital expenditures except as set forth in the Budget.

SECTION 6.05     **Guaranties and Other Liabilities**.  Purchase or repurchase (or agree, contingently or otherwise, so to do) the indebtedness of, or assume, guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance of any obligation or capability of so doing, or otherwise), endorse or otherwise become liable, directly or indirectly, in connection with the obligations, stock or dividends of any Person, except (i) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business and (ii) to the extent existing on the Filing Date.

SECTION 6.06     **Chapter 11 Claims**.  Incur, create, assume, suffer to exist or permit any other claim which is pari passu with or senior to the Superpriority Claims of the Lender against the Borrower hereunder, except for the Carve-Out Expenses.

SECTION 6.07     **Dividends; Capital Stock**.  Declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital, purchase or redemption of shares or otherwise) any shares of capital stock (or any options, warrants, rights or other equity securities or agreements relating to any capital stock), or set apart any sum for the aforesaid purposes.

SECTION 6.08     **Transactions with Affiliates**.  Sell or transfer any property or assets to, or otherwise engage in any other transactions with, any Affiliates or such Affiliates' shareholders, other than transactions (i) in the ordinary course of business at prices and on terms

and conditions not less favorable to the Borrower could be obtained on an arm's-length basis from unrelated third parties and (ii) transactions permitted in the Loan Documents and the transactions contemplated thereby.

SECTION 6.09 **Investments, Loans and Advances**. Purchase, hold or acquire any capital stock, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment in, any other Person (all of the foregoing, "Investments").

SECTION 6.10 **Disposition of Assets**. Sell or otherwise dispose of any assets or permit any of its Subsidiaries to do so, except for sales or dispositions, with the Bankruptcy Court's approval, pursuant to a Section 363 Sale.

SECTION 6.11 **Nature of Business**. Enter into any business that is materially different from those conducted by the Borrower on the Filing Date except as required by the Bankruptcy Code.

SECTION 7.     **EVENTS OF DEFAULT**

SECTION 7.01 **Events of Default**. In the case of the happening of any of the following events and the continuance thereof beyond the applicable period of grace if any (each, an "Event of Default"):

(a)     any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower;

(b)     the commencement of any action or contested matter to (i) challenge the validity, perfection, priority or amount of any of the Liens, (ii) assert any claim or cause of action against any of the Lender in connection therewith; or (iii) substantively consolidate the estate of any of the Borrower with any non-debtor entity;

(c)     failure of the Bankruptcy Court to enter the Interim Order in a form acceptable to the Lender and its counsel in their sole and absolute discretion, within seven (7) Business Days of the Filing Date;

(d)     failure of the Bankruptcy Court to enter the Final Order approving the DIP Facility in the form attached hereto as Exhibit A-2 or in such other form as may be acceptable to the Lender and its counsel in their sole and absolute discretion, within twenty-eight (28) days after the Filing Date;

(e)     failure by the Borrower to perform or comply in any material respect with any term, condition, covenant, representation, warranty or obligation contained herein, any of the Orders or any of the other Loan Documents, on their part to be performed or complied with where any such failure to perform or comply is not remedied within three (3) Business Day following written notice of the default; provided, however, that no notice of default or cure shall apply to any default that is the result of the entry of a court order;

-10-

(f)     unless otherwise consented to in writing by the Lender, if, as of any Reporting Date, the Borrower's cumulative cash disbursements in any month period negatively varies by more than 10% in excess on any line item or exceeds scheduled disbursements by more than 5% in the aggregate;

(g)     failure by the Borrower prior to the 60-Day Termination Date to either (i) file a Reorganization Plan acceptable to the Lender or (ii) within the period prescribed within section 5.13 hereof file a motion seeing approval by the Bankruptcy Court of a Section 363 Sale and related sale procedures, in form and substance acceptable to the Lender to a stalking horse buyer;

(h)     any representation or warranty made by the Borrower in this Agreement or in any Loan Document or in connection with this Agreement or the credit extensions hereunder or any statement or representation made in any report, financial statement, certificate or other document furnished by the Borrower to the Lender under or in connection with this Agreement, shall prove to have been false or misleading in any material respect when made or delivered;

(i)     default shall be made in the payment of any (i) fees or interest on the DIP Loan and such default shall continue unremedied for more than one (1) Business Day, (ii) other amounts payable when due (other than amounts set forth in clauses (i) and (iii) hereof), and such default shall continue unremedied for more than five (5) Business Days or (iii) principal of the DIP Loan when and as the same shall become due and payable by acceleration thereof or otherwise;

(j)     the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Borrower shall file a motion or other pleading seeking the dismissal of the Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 of the Bankruptcy Code, or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or a Chapter 11 Trustee other than Robert Swett, shall be appointed in the Case; the Borrower's managers or directors shall authorize a liquidation of the Borrower's business; or an application shall be filed by the Borrower for the approval of any other Superpriority Claim (other than the Carve-Out Expenses);

(k)     the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest other than the Lender to permit (i) foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Borrower or (ii) litigation against Lender within the Bankruptcy Court of any claim or cause of action on objection by any claimant holding claims against the Borrower;

(l)     a Change of Control shall occur;

(m)     the Borrower shall fail to deliver the Budget when due and such default shall continue unremedied for more than one (1) Business Day;

(n)     any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower, or the Borrower shall so assert in any pleading filed in

any court or any material portion of any Lien (as reasonably determined by the Lender) intended to be created by the Loan Documents or the Orders shall cease to be or shall not be a valid and perfected Lien having the priorities contemplated hereby or thereby;

(o) an order of the Bankruptcy Court shall be entered modifying, reversing, staying, vacating or (without the written consent of the Lender) otherwise amending, supplementing or modifying in a manner adverse to the Lender ( as determined by the Lender in its sole discretion) any of the Orders or any Loan Document;

(p) any judgment or order with respect to a post-petition event shall be rendered against the Borrower which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Borrower, (ii) have a material adverse effect on the ability of the Borrower to perform its respective obligations under any Loan Document, or (iii) have a material adverse effect on the rights and remedies of the Lender under any Loan Document;

(q) any Borrower shall make any Pre-Petition Payment (including, without limitation, reclamation claims) other than payments authorized by the Bankruptcy Court or the Budget;

(r) unless otherwise consented to in writing by the Lender, failure of the Borrower to comply with the Budget, including without limitation, failure by the Borrower to comply with weekly production quotas contained therein with a variance of 10%;

(s) any key personnel of the Borrower or Robert Swett, dies, becomes legally incapacitated or ceases to be employed by the Borrower;

(t) the Borrower loses any key customers or suppliers to be determined in the Lender's sole and absolute discretion;

then, and in every such event and at any time thereafter during the continuance of such event, and without further order of or application to the Bankruptcy Court, the Lender may, by notice to the Borrower (with a copy to Borrower's counsel, counsel for the Official Creditors' Committee appointed in the Case, and the United States Trustee) in the cases of clauses (i) and (ii) below and by notice required by applicable law in the case of clause (iii) below, or immediately on or after the 60-Day Termination Date (or if applicable, the 90-Day Termination Date), take one or more of the following actions, at the same or different times, individually or in combination (provided, that with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral, the Lender shall provide the Borrower and their counsel (with a copy to counsel for the Official Creditors' Committee in the Case, and to the United States Trustee for the District in which the Case is pending), with three (3) Business Days' written notice prior to taking the action contemplated thereby, and in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing): (i) terminate forthwith the DIP Facility Commitment; (ii) declare the DIP Loan then outstanding to be forthwith due and payable, whereupon the principal of the DIP Loan together with accrued interest thereon and all other liabilities of the Borrower accrued hereunder and under any other Loan Document shall

become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; or (iii) exercise any and all remedies under the Loan Documents, the Orders and applicable law available to the Lender.

SECTION 8.        **[RESERVED]**

SECTION 9.        **[RESERVED]**

SECTION 10.        **MISCELLANEOUS**

        SECTION 10.01    <u>**Notices**</u>.  Notices and other communications provided for herein shall be in writing (including facsimile communication) and shall be mailed, transmitted by facsimile or delivered to

Borrower:

CRS Holding of America, LLC
c/o Robert Swett
4303 Lukow Place
Valrico, FL  33596
rswett@robertswettconsulting.com

with a copy to:

Jay Verona
Shumaker, Loop & Kendrick, LLP
101 E Kennedy Blvd, Ste 2800
Tampa, FL 336025150
jverona@slk-law.com


 and to Lender at

Bryan Cheek
Regions Bank
111 N. Orange Ave.,
Orlando, FL 32801

with a copy to

W. Keith Fendrick
(keith.fendrick@hklaw.com)
 and Noel Boeke
 (noel.boeke@hklaw.com)
Holland & Knight, LLP
100 N. Tampa Street

Suite 4100, Tampa, FL 33602

or such other address as such party may from time to time designate by giving written notice to the other parties hereunder. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the second Business Day after the date when sent by registered or certified mail, postage prepaid, return receipt requested, if by mail; or when receipt is acknowledged, if by any facsimile equipment of the sender; or the Business Day following the day on which the same has been delivered to a reputable national overnight air courier service; in each case addressed to such party as provided in this <u>Section 10.01</u> or in accordance with the latest unrevoked written direction from such party.

SECTION 10.02 **Survival of Agreement, Representations and Warranties, etc**. All warranties, representations and covenants made by the Borrower herein or in any certificate or other instrument delivered by it or on its behalf in connection with this Agreement shall be considered to have been relied upon by the Lender and shall survive the making of the Advances herein contemplated regardless of any investigation made by the Lender or on its behalf and shall continue in full force and effect so long as any amount due or to become due hereunder is outstanding and unpaid (other than contingent indemnification obligations as to which no claim giving rise thereto has been asserted) and so long as DIP Facility Commitment has not been terminated. All statements in any such certificate or other instrument shall constitute representations and warranties by the Borrower hereunder with respect to the Borrower.

SECTION 10.03 **Successors and Assigns**.

(a) This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns. The Borrower may not assign or transfer any of their rights or obligations hereunder without the prior written consent of all of the Lender. The Lender may sell participations to any Person in all or part of any Advance, or all or part of its DIP Facility Commitment Percentage, in which event, without limiting the foregoing, the provisions of this Agreement shall inure to the benefit of each purchaser of a participation (provided that such participant shall look solely to the seller of such participation for such benefits and the Borrower's liability, if any, under <u>Section 2.10</u> shall not be increased as a result of the sale of any such participation) and the pro rata treatment of payments, as described in <u>Section 2.09</u>, shall be determined as if the Lender had not sold such participation. In the event the Lender shall sell any participation, the Lender shall retain the sole right and responsibility to enforce the obligations of the Borrower relating to the Advances, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement (provided that the Lender may grant its participant the right to consent to such Lender's execution of amendments, modifications or waivers which (i) reduce any fees payable hereunder to the Lender, (ii) reduce the amount of any scheduled principal payment on any Advance or reduce the principal amount of any Advance or the rate of interest payable hereunder or (iii) extend the maturity of the Borrower's obligations hereunder). The sale of any such participation shall not alter the rights and obligations of the Lender selling such participation hereunder with respect to the Borrower.

(b)     The Lender may assign to one or more eligible assignees (including without limitation any Affiliate) all or a portion of its interests, rights and (with the consent of the assignee) obligations under this Agreement (including, without limitation, all or a portion of the Advances at the time owing to it).

(c)     The Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.03, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided that prior to any such disclosure, each such assignee or participant or proposed assignee or participant shall agree in writing to keep such information confidential.

SECTION 10.04   **Expenses**.  Whether or not the transactions hereby contemplated shall be consummated, the Borrower agree to pay all reasonable out-of-pocket expenses (promptly upon written demand, together with backup documentation reasonably supporting such reimbursement request) incurred by the Lender in connection with the preparation, execution, delivery and administration of this Agreement and the other Loan Documents, the making of the DIP Loan, the perfection of the Liens contemplated hereby, and all reasonable out-of-pocket expenses incurred by the Lender in the monitoring of and participation in the Case and in the enforcement or protection of the rights of the Lender in connection with this Agreement or the other Loan Documents, including but not limited to the reasonable fees and disbursements of any counsel for and consultants to the Lender.  Such payments shall be made as of the date of the first Advance under the Interim Order and thereafter on demand upon delivery of a statement setting forth such costs and expenses.

SECTION 10.05   **Indemnity**.   The Borrower shall indemnify and hold harmless the Lender and its members, and each of their Affiliates, respective officers, directors, members, partners, employees, authorized persons, agents, advisors, attorneys and representatives of each (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the DIP Facility, the DIP Facility documentation or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, except to the extent such claim, damage, loss, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceedings to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, any of their directors, security holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  The Borrower further agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrower or any of their security holders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in

a final judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

SECTION 10.06  **Non-Prosecution by Borrower**.  The Borrower (a) agrees not to assert any claim against the Lender and its members, and each of their Affiliates, agents, attorneys, officers, directors and employees, and each of their respective successors and assigns, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any aspect of the pre-petition relationships between the Lender and its members, and each of their respective Affiliates and the Borrower, or any other acts or omissions of the Lender and its members, and each of their respective Affiliates, and their respective successors and assigns, in connection with their pre-petition relationship with the Borrower; provided, however, that all of the foregoing is subject to the "Third-Party Investigation Rights" set forth in the Orders.

SECTION 10.07  **Choice of Law**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF [DELAWARE] AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

SECTION 10.08  **No Waiver**.  No failure on the part of the Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

SECTION 10.09  **Extension of Maturity**.  Should any payment of principal of or interest or any other amount due hereunder become due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, in the case of principal, interest shall be payable thereon at the rate herein specified during such extension.

SECTION 10.10  **Amendments, etc**.  No modification, amendment or waiver of any provision of this Agreement or the Collateral Documents, and no consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No amendment to this Agreement shall be effective against the Borrower unless signed by the Borrower.

SECTION 10.11  **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.12  **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

SECTION 10.13   **Execution in Counterparts**.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.   Any signatures delivered by a party by facsimile transmission or by e-mail transmission of an adobe file format document (also known as a PDF file) shall be deemed an original signature hereto.

SECTION 10.14   **Prior Agreements**.  This Agreement and the other Loan Documents represent the entire agreements of the parties with regard to the subject matter hereof and thereof and the terms of any letters and other documentation entered into between the Borrower and the Lender prior to the execution of this Agreement which relate to Advances to be made hereunder shall be replaced by the terms of this Agreement.

SECTION 10.15   **Further Assurances**.  Whenever and so often as reasonably requested by the Lender, the Borrower will promptly execute and deliver or cause to be executed and delivered all such other and further instruments, documents or assurances, and promptly do or cause to be done all such other and further things, as may be necessary and reasonably required in order to further and more fully vest in the Lender all rights, interests, powers, benefits, privileges and advantages conferred or intended to be conferred by this Agreement and the other Loan Documents.

SECTION 10.16   **Waiver of Jury Trial**.   BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 10.17   **Publicity**.  Borrower will not, and will not permit any of its Affiliates to, disclose the name of Lender or any of its Affiliates or refer to this Agreement or the other Loan Documents in any press release or other public disclosure or in any prospectus, proxy statement or other materials filed with any Governmental Authority without Lender's prior written consent unless Borrower or any of its Affiliates is required to do so under applicable law, and then, in any event, Borrower or such Affiliate will consult with Lender prior to such disclosure.  Borrower consents to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement.   Lender consent to Borrower's orally disclosing to its vendors, landlords and prospective landlords, and other third parties, who need to know in the reasonable judgment of Borrower, only the name of Lender, the amount of the Advances (including loan balances and any other information required to terminate or replace the Advances), and the Maturity Date.  Any written materials of any type disclosing any information of the type referred to herein shall require the written approval of

Lender prior to being disseminated to any Person, under such written materials are of public record or presented to the Bankruptcy Court not under seal.

SECTION 10.18 **Parties Including Trustees; Bankruptcy Court Proceedings**. This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the conversion of the Case or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

**{remainder of page intentionally left blank}**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

CRS HOLDING OF AMERICA, LLC, a Delaware limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS, LLC, a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

DYNAMIC LEASING LLC,

a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

BARGAIN COMPUTER PRODUCTS OF YBOR CITY, LLC, a Florida limited liability company

By: _____

    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF NORTH FLORIDA, LLC, a Florida limited liability company



By: _____

    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF SOUTH FLORIDA, LLC, a Florida limited liability company



By: _____

    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF GEORGIA, LLC, a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SERVICES, LLC, a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF NORTH CAROLINA, LLC, a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF KENTUCKY, LLC, a Florida limited liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF
TENNESSEE, LLC, a Florida limited liability
company


By:_____
    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING TECHNOLOGIES,
LLC, a Florida limited liability company


By:_____
    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING TECHNOLOGIES II,
LLC, a Florida limited liability company


By:_____
    Robert Edward Swett, as its

    Restructuring Officer


CREATIVE RECYCLING SYSTEMS OF
PENNSYLVANIA, LLC, a Florida limited liability
company


By:_____

Robert Edward Swett, as its

Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF
LOUISIANA, LLC, a Florida limited liability
company

By:_____

Robert Edward Swett, as its

Restructuring Officer

CREATIVE RECYCLING SOLUTIONS, LLC, a
Florida limited liability company

By:_____

Robert Edward Swett, as its

Restructuring Officer

CREATIVE RECYCLING TECHNOLOGIES III,
LLC, a Florida limited liability company

By:_____

Robert Edward Swett, as its

Restructuring Officer

ENVIRONMENTAL SERVICES SALES &
MARKETING, LLC, a Florida limited liability
company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS OF
ILLINOIS, LLC, a Florida limited liability
company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

PLANET GADGET USA, LLC, a Florida limited
liability company

By:_____

    Robert Edward Swett, as its

    Restructuring Officer

GREENROCK RARE EARTH RECOVERY, LLC,
a Florida limited liability company

By: _____

    Robert Edward Swett, as its

    Restructuring Officer

CREATIVE RECYCLING SYSTEMS ON NEW
ENGLAND, LLC, a Florida limited liability
company

By: _____

## List of Schedules and Exhibits

Schedule 2.03:          Budget

Schedule 3.04:          Organizational Chart and Borrower Information

Schedule 3.05:          Liens

Schedule 3.09(a)        Litigation

Schedule 3.09(b)        Labor Matters

Schedule 3.11:          Ownership of Property

Schedule 3.14           Hazardous Materials and Environmental Matters

Schedule 3.16           Deposit and Disbursement Accounts

Schedule 3.18           Customer and Trade Relations

Schedule 3.19           Agreements and Other Documents


Exhibit A-1:            Form of Interim Order

Exhibit A-2:            Form of Final Order

**Schedule 2.03**
<u>**Budget**</u>

See attachment.

**Schedule 3.04**
**Organizational Chart and Borrower Information**

**[RESERVED]**

**Schedule 3.05**
**<u>Liens</u>**

To be provided.

**Schedule 3.09(a)**
**<u>Litigation</u>**

To be provided.

**Schedule 3.09(b)**
**<u>Labor Matters</u>**

None.

**Schedule 3.11**
**<u>Ownership of Property</u>**

**[RESERVED]**

**Schedule 3.14**
**Hazardous Materials and Environmental Matters**

**[RESERVED]**

**Schedule 3.16**
**<u>Deposit and Disbursement Accounts</u>**

To be provided.

**Schedule 3.18**
**<u>Customer and Trade Relations</u>**

To be provided.

**Schedule 3.19**
**<u>Agreements and Other Documents</u>**

To be provided.

**Exhibit A-1**
**Form of Interim Order**

To be provided.

**Exhibit A-2**
**<u>Form of Final Order</u>**

To be provided.

# TABLE OF CONTENTS

**SECTION 1. DEFINITIONS** ...................................................................................................... **1**

*SECTION 1.01 DEFINED TERMS.* ........................................................................................... *1*

*SECTION 1.02 TERMS GENERALLY* ...................................................................................... *8*

**SECTION 2. AMOUNT AND TERMS OF CREDIT** .................................................. **9**

*SECTION 2.01 DIP FACILITY; AVAILABILITY; COMMITMENT FEE* ..................................... *9*

*SECTION 2.02 CONDITIONS TO MAKING EACH ADVANCE* ..................................................... *9*

*SECTION 2.03 USE OF PROCEEDS* ..................................................................................... *11*

*SECTION 2.04 REPAYMENT OF DIP LOAN; EVIDENCE OF DEBT* ....................................... *11*

*SECTION 2.05 INTEREST ON LOANS* .................................................................................. *11*

*SECTION 2.06 DEFAULT INTEREST* .................................................................................... *12*

*SECTION 2.07 MANDATORY PREPAYMENTS; COMMITMENT TERMINATION; COLLATERAL* ............. *12*

*SECTION 2.08 OPTIONAL PREPAYMENT OF LOANS* ........................................................... *12*

*SECTION 2.09 PRO-RATA TREATMENT; PAYMENTS, ETC* ................................................... *12*

*SECTION 2.10 GROSS-UP FOR TAXES* ................................................................................ *12*

*SECTION 2.11 CERTAIN EXPENSES* .................................................................................... *13*

*SECTION 2.12 PRIORITY AND LIENS* ................................................................................. *13*

*SECTION 2.13 RIGHT OF SET-OFF* ..................................................................................... *15*

*SECTION 2.14 PAYMENT OF OBLIGATIONS* ....................................................................... *15*

**SECTION 3. REPRESENTATIONS AND WARRANTIES** .......................................... **15**

*SECTION 3.01 ORGANIZATION AND AUTHORITY* ............................................................... *15*

*SECTION 3.02 DUE EXECUTION; NO CONSENTS* ................................................................ *15*

*SECTION 3.03 STATEMENTS MADE* .................................................................................... *16*

*SECTION 3.04 OWNERSHIP; LOCATION* .............................................................................. *16*

*SECTION 3.05 LIENS* ......................................................................................................... *17*

*SECTION 3.06 COMPLIANCE WITH LAWS* ......................................................................... *17*

*SECTION 3.07 INSURANCE* ................................................................................................ *17*

*SECTION 3.08 USE OF PROCEEDS* ..................................................................................... *17*

*SECTION 3.09 LITIGATION; LABOR MATTERS* ................................................................... *17*

*SECTION 3.10 MARGIN REGULATIONS; INVESTMENT COMPANY ACT; BROKERS* .............................. *18*

*SECTION 3.11 OWNERSHIP OF PROPERTY; LIENS* ............................................................. *18*

*SECTION 3.12 TAXES* ........................................................................................................ *19*

*SECTION 3.13 ERISA* ....................................................................................................... *19*

*SECTION 3.14 HAZARDOUS MATERIALS* ........................................................................... *20*

SECTION 3.15 *[RESERVED]*.................................................................................... 20

SECTION 3.16 *DEPOSIT AND DISBURSEMENT ACCOUNTS* ............................................ 20

SECTION 3.17 *[RESERVED]*.................................................................................... 21

SECTION 3.18 *CUSTOMER AND TRADE RELATIONS* .................................................... 21

SECTION 3.19 *AGREEMENTS AND OTHER DOCUMENTS* ............................................... 21

SECTION 3.20 *BANKRUPTCY MATTERS* .................................................................... 21

SECTION 3.21 *SURVIVAL OF REPRESENTATIONS AND WARRANTIES, ETC.* ..................... 22

**SECTION 4.     CONDITIONS OF LENDING**...........................................................**22**

SECTION 4.01 *CONDITIONS PRECEDENT TO FUNDING THE INTERIM DIP LOAN* ............... 22

SECTION 4.02 *CONDITIONS PRECEDENT TO FUNDING THE FINAL DIP LOAN* .................. 23

**SECTION 5.     AFFIRMATIVE COVENANTS**...........................................................**24**

SECTION 5.01 *FINANCIAL STATEMENTS, REPORTS, ETC*.............................................. 24

SECTION 5.02 *FINANCIAL STATEMENTS* ................................................................... 25

SECTION 5.03 *CORPORATE EXISTENCE* .................................................................... 25

SECTION 5.04 *INSURANCE* ..................................................................................... 25

SECTION 5.05 *OBLIGATIONS AND TAXES* .................................................................. 25

SECTION 5.06 *NOTICE OF EVENT OF DEFAULT, ETC*................................................... 26

SECTION 5.07 *ACCESS TO BOOKS AND RECORDS* ..................................................... 26

SECTION 5.08 *APPRAISALS* .................................................................................... 26

SECTION 5.09 *COMPLIANCE WITH TERMS OF LEASEHOLDS*......................................... 26

SECTION 5.10 *BUSINESS PLAN* ............................................................................... 26

SECTION 5.11 *CHIEF RESTRUCTURING OFFICER*....................................................... 26

SECTION 5.12 *SECURITY AND PLEDGE AGREEMENT; MORTGAGE*................................. 26

SECTION 5.13 *REORGANIZATION PLAN; SECTION 363 SALE*....................................... 27

**SECTION 6.     NEGATIVE COVENANTS**.................................................................**27**

SECTION 6.01 *LIENS*............................................................................................. 27

SECTION 6.02 *MERGER, ETC.* ................................................................................ 27

SECTION 6.03 *INDEBTEDNESS*................................................................................ 27

SECTION 6.04 *CAPITAL EXPENDITURES* ................................................................... 27

SECTION 6.05 *GUARANTIES AND OTHER LIABILITIES*................................................. 27

SECTION 6.06 *CHAPTER 11 CLAIMS* ....................................................................... 27

SECTION 6.07 *DIVIDENDS; CAPITAL STOCK* ............................................................ 27

SECTION 6.08 *TRANSACTIONS WITH AFFILIATES*...................................................... 28

SECTION 6.09 *INVESTMENTS, LOANS AND ADVANCES* ............................................... 28

SECTION 6.10 *DISPOSITION OF ASSETS* ................................................................... 28

*SECTION 6.11  NATURE OF BUSINESS*.................................................................................................... *28*

*SECTION 6.12  BREACH OF THE SUPPLY AGREEMENT* ............................................................................ *28*

**SECTION 7.    EVENTS OF DEFAULT**........................................................................................**28**

*SECTION 7.01  EVENTS OF DEFAULT*..................................................................................................... *28*

**SECTION 8.    [Reserved]**...............................................................................................................**31**

**SECTION 9.    [RESERVED]**...........................................................................................................**31**

**SECTION 10.  MISCELLANEOUS** ................................................................................................**31**

*SECTION 10.01  NOTICES*...................................................................................................................... *31*

*SECTION 10.02  SURVIVAL OF AGREEMENT, REPRESENTATIONS AND WARRANTIES, ETC.* ............ *31*

*SECTION 10.03  SUCCESSORS AND ASSIGNS*....................................................................................... *32*

*SECTION 10.04  EXPENSES*.................................................................................................................... *32*

*SECTION 10.05  INDEMNITY*.................................................................................................................. *33*

*SECTION 10.06  RELEASES*.................................................................................................................... *33*

*SECTION 10.07  CHOICE OF LAW*.......................................................................................................... *33*

*SECTION 10.08  NO WAIVER*................................................................................................................. *34*

*SECTION 10.09  EXTENSION OF MATURITY*.......................................................................................... *34*

*SECTION 10.10  AMENDMENTS, ETC.*.................................................................................................... *34*

*SECTION 10.11  SEVERABILITY*............................................................................................................. *34*

*SECTION 10.12  HEADINGS*................................................................................................................... *34*

*SECTION 10.13  EXECUTION IN COUNTERPARTS*.................................................................................. *34*

*SECTION 10.14  PRIOR AGREEMENTS*................................................................................................... *34*

*SECTION 10.15  FURTHER ASSURANCES*............................................................................................... *34*

*SECTION 10.16  WAIVER OF JURY TRIAL*............................................................................................. *35*

*SECTION 10.17  PUBLICITY*.................................................................................................................. *35*

*SECTION 10.18  PARTIES INCLUDING TRUSTEES; BANKRUPTCY COURT PROCEEDINGS* ................. *35*

**LIST OF SCHEDULES AND EXHIBITS**...............................................................................................**2**

#32496699_v4

# EXHIBIT C

| | September Month | October Month | Total |
|---|---|---|---|
| **Cash Receipts** | | | |
| **Total Cash Receipts** | 850,000 | 950,000 | 1,800,000 |
| | | | |
| **Cost of Goods Sold** | | | |
| Direct labor | 186,989 | 274,454 | 461,444 |
| Direct taxes | 46,546 | 68,318 | 114,864 |
| Direct benefits | 29,860 | 25,220 | 55,080 |
| Temporary labor | - | - | - |
| Logistics | - | - | - |
| Materials | 150,000 | 150,000 | 300,000 |
| Transfers | 60,000 | 10,000 | 70,000 |
| Truck Rentals | | | - |
| Freight - Other | 75,000 | 75,000 | 150,000 |
| Packaging | 10,000 | 10,000 | 20,000 |
| Fuel | 30,000 | 30,000 | 60,000 |
| Recycling Fees | 2,000 | 2,000 | 4,000 |
| Disposal - Other | 2,000 | 2,000 | 4,000 |
| Propane | 2,000 | 2,000 | 4,000 |
| Transport Foreign | - | - | - |
| Treatment Charges | - | - | - |
| Transport - Glass Recycling | 300,000 | 200,000 | 500,000 |
| **Cost of Goods Sold** | 894,395 | 848,993 | 1,929,915 |
| | | | |
| **Net Cash Flow Margin** | (44,395) | 101,007 | (129,915) |
| | | | |
| **Selling, General & Admin. Exp** | | | |
| Salaries & Wages | 217,821 | 245,269 | 463,089 |
| Employee Staying Bonus | 30,000 | 30,000 | 60,000 |
| Benefits | 15,530 | 8,060 | 23,590 |
| Facility Lease | - | - | - |
| Insurance | 40,000 | 40,000 | 80,000 |
| Temp Labor | - | - | - |
| Payroll Taxes | 61,688 | 68,521 | 130,209 |
| Travel | - | - | - |
| Professional Fees | - | - | - |
| Internet | 15,000 | 15,000 | 30,000 |
| Electric | 5,000 | 5,000 | 10,000 |
| Offices Supplies | 500 | 500 | 1,000 |
| Sponsorships/Memberships | - | - | - |
| Ad / Collateral Materials | - | - | - |
| Warehouse Supplies/Tools | 1,000 | 1,000 | 2,000 |
| Credit Card & Bank Fees | 10,000 | 10,000 | 20,000 |
| Vehicle/Truck Maintenance | - | - | - |
| Equipment Rental | - | - | - |
| Repairs & Maintenance - Equipment | - | - | - |
| Telephone & Fax | 5,000 | 5,000 | 10,000 |
| Accounting & Audit Fees | - | - | - |
| Legal Expense | - | - | - |
| Quality Certification Expense | - | - | - |
| Payroll Service Expense | 3,000 | 5,000 | 8,000 |
| Cell Phone Expense | - | - | - |
| Professional Fees - Other | - | - | - |
| Licenses & Fees | 60,000 | - | 60,000 |
| Consulting | - | - | - |
| Natural Gas | - | - | - |
| Listing Fees | 9,000 | 9,000 | 18,000 |

| | | | |
|---|---|---|---|
| Security | 1,000 | 1,000 | 2,000 |
| Sales & Commissions | - | - | - |
| Uniforms | - | - | - |
| Fuel - Admin | - | - | - |
| Bad Debt Expense | - | - | - |
| Collection Expense | - | - | - |
| Corporate Lease | - | - | - |
| Vehicle Lease | - | - | - |
| Water/Sewerage | 500 | 500 | 1,000 |
| Repairs & Maintenance - Facility | - | - | - |
| Receiver and Staff Fee | 70,000 | 40,000 | 110,000 |
| Receiver's Attorney Fee | 120,000 | 50,000 | 170,000 |
| Filing Fees | 30,000 | - | 30,000 |
| Facility Move | - | 35,000 | 35,000 |
| All Other | - | - | - |
| **Total SG&A** | 695,039 | 568,850 | 1,432,834 |
| | | | |
| **Operating Cash Flow (Deficit)** | ($739,434) | ($467,842) | ($1,207,276) |
| | | | |
| **Cash Infusion** | $750,000 | $250,000 | $1,000,000 |
| | | | |
| **Change in Cash** | 10,566 | (217,842) | (207,276) |
| **Beginning Balance** | 200,000 | 210,566 | 200,000 |
| **Ending Balance** | 210,566 | (7,276) | (7,276) |